FRANK HORN v. E. S. RHOADS, Appellant.—296 S. W. 389.

Division One, June 25, 1927.

**NEGLIGENCE: Automobile Driver: Agent or Servant: Permissive Use: Respondeat Superior.** A witness, having repaired a car for its owner for a definite compensation and in the course of the work having learned that the owner would sell the car for $750, went to the owner, told him he had a prospective buyer and requested the owner to permit the witness to take the car out of the garage and demonstrate it to the prospective purchaser; and having obtained such permission, borrowed a dollar from the owner with which to buy gasoline, and took the car on a public highway, and by his negligence collided with and injured plaintiff. The understanding, or assumed understanding, between the witness and the owner was that if the witness could sell the car for more than $750 the witness could retain the excess. **Held,** that the witness, having on his own initiative and for his own purposes obtained the owner's permission to take the car out for demonstration to a prospective purchaser, was engaged in his own business, and not in that of the owner, and the owner is not liable for the consequences of the witness's negligence under the rule of **respondeat superior.**

---

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2571, p. 673, n. 23. **Master and Servant,** 39 C. J., Section 1530, p. 1324, n. 11.

Transferred from Kansas City Court of Appeals.

REVERSED.

*Cleary & Barnett* and *John R. James* for appellant.

(1) Appellant, the alleged employer, is liable for the negligence of Johnson, the alleged agent or servant, only in the event Johnson: (a) Was the agent or servant of appellant, and (b) was, at the time and place in question, acting within the scope of his employment. Babbitt on Law Applied to Motor Vehicles (3 Ed.) sec. 1085; Home Ins. Co. v. Henderson Lodge, 257 S. W. 422; Wrightman v. Glide-well, 210 Mo. App. 367; Ursch v. Heier, 210 Mo. App. 129; Guthrie v. Holmes, 272 Mo. 215. (2) Johnson was neither the agent nor the servant of appellant. (a) His relationship to appellant does not conform to the definition of either an agent or a servant. 1 Labbatt, Master & Servant (2 Ed.) sec. 2; 4 Elliott on Contracts, sec. 2831. (b) In order to constitute Johnson either an agent or servant of appellant, the evidence must show a contractual relationship between Johnson and appellant. Babbitt on Law Applied to Motor Vehicles (3 Ed.) sec. 1085. (c) No contractual relationship of any kind existed between Johnson and appellant. McCoy v. Griffith, 196 Ky. 406. (d) Even if any contractual relationship did exist, it was such as to constitute Johnson merely an independent contractor. Smith v. Howard, 256 S. W. 402; Stamper v. Jesse, 250 S. W. 1008; Thomassen v. Water & Light Co., 251 S. W. 450; Premier Motor Mfg. Co. v. Tilford, 111 N. E. 645; Berry on Automobiles, sec. 1033, p. 961; Goodrich v. Fence & Automobile Co., 135 N. W. 58; Barton v. Studebaker Corporation, 189 Pac. 1025; Wright v. Motor Car Co., 177 Pac. 237; Calhoon v. Mining Co., 202 Mo. App. 564; Wooley v. Doby, 92 S. E. 295; Emery v. McCombs, 167 N. Y. Supp. 474; Coonse v. Bethold, 125 N. E. 416; Sweetman v. Snow, L. R. A. 1916 B (Mich.) 757; Ouellete v. Motor & Machine Corp. (Wis.), 52 L. R. A. (N. S.) 299; Neff v. Brandies, 39 L. R. A. (N. S.) 933. (e) Even if any contractual relationship did exist between Johnson and appellant, such as to constitute Johnson the agent of appellant, such contractual relationship covered only Johnson's right to sell the car and did not include any right in him to the possession and use of the car. His possession and use of the car was merely that of licensee. Mere license to use the car does not create agency or the relation of master and servant. Mount v. Naert, 253 S. W. 966; Hays v. Hogan, 273 Mo. 1; Drake v. Rowan, 272 S. W. 101.

*Harry G. Kyle, Kenneth W. Tapp* and *Walter A. Raymond* for respondent.

(1) The relation of master and servant may be proved by circumstances. 26 Cyc. 1519; Sandifer v. Lynn, 52 Mo. App. 553; Roberson

v. Clevenger, 111 Mo. App. 622, 86 S. W. 512; McCloud v. Western Union Tel. Co., 170 Mo. App. 624, 157 S. W. 101; Singer Mfg. Co. v. Rahn, 132 U. S. 518; Hinkle v. Railroad, 199 S. W. 227. (2) The relation of appellant and Johnson was that of master and servant. Byrne v. Railroad Co., 61 Fed. 605; Standard Oil Co. v. Anderson, 212 U. S. 215; Hoffman v. Motors Co., 125 N. E. 845; Vaughn v. Davis & Sons, 221 S. W. 782; Fitzgerald v. Cardwell, 226 S. W. 971; Simmons v. Murray, 234 S. W. 1009; Borah v. Motor Co., 257 S. W. 145. (3) The relation of appellant and Johnson was properly submitted to the jury, and its finding should not be disturbed. Rosenberg v. Dahl, 162 Ky. 92, 172 S. W. 113, Ann. Cas. 1916 E, 1110; Standard Oil Co. v. Parkinson, 152 Fed. 681; Muex v. Holler, 162 S. W. 688; Burgess v. Garvin, 272 S. W. 108; Thomassen v. Water & Lt. Co., 278 S. W. 979.

RAGLAND, J.—Plaintiff, who was driving along a public highway near Kansas City in an automobile, suffered injuries to his person and to his car through a collision with another automobile which was proceeding along the highway in an opposite direction and which was owned by defendant but driven and operated by one Johnson. The collision resulted from Johnson's negligence. This action is to recover the damages sustained by plaintiff. Defendant was not in charge of his automobile in person, he was not even present. If he is liable for plaintiff's injuries, it is because Johnson was at the time of the occurrence acting in the capacity of agent or servant of the defendant. Whether he was or not is the sole question in the case. For a solution of that question the evidence must be looked to.

At the times hereinafter referred to, defendant was engaged in "the mill business," manufacturing doors and sashes; Johnson was an automobile mechanic, not regularly employed as such, nor owning a business of his own, but doing "odd jobs" here and there as occasion offered. He was never at any time in defendant's general employ for any purpose. In the early part of 1922, defendant had a five-passenger touring car which he had been using for a number of years and which he desired to have "overhauled" and put "in good running condition." This work Johnson contracted to do, and did do, for the lump sum of $100. The work of putting the car in repair was done on defendant's premises and was completed and paid for about the middle of April, 1922. During the time that Johnson was working on the car he learned from defendant that the latter was willing to sell the car when the repairs were completed, and that he would sell it for $750. Thereafter Johnson, apparently on his own initiative and without suggestion of any kind on the part of defendant, showed the car to a number of persons with the view of interesting them in its purchase. But the car was never taken out for a demonstration until May 7, 1922. On that day, Johnson, while

driving the car to the place where he was to demonstrate it to a prospective buyer, collided with plaintiff's car, causing the injuries complained of. Now a finding that Johnson on that occasion took the car out for demonstration as the agent or servant of defendant must rest solely on the testimony of Johnson, who was called as a witness by plaintiff, for plaintiff offered no other evidence on that issue, and the defendant's evidence gives him no aid. A part of Johnson's testimony has been summarized; the remainder, so far as relevant to the question under consideration, is as follows:

### DIRECT EXAMINATION.

"Q. How did you happen to meet him [defendant] on that day [May 7, 1922]? A. Well, I met him at his office, and talked about selling the car. He had a car he wanted to sell, a used car, a Mercer car. . . . And he told me if I had a buyer for it, to go out and demonstrate it. . . . I asked him if I could take the car out to demonstrate it, about 3:30 or four o'clock, May seventh. . . .

"Q. Go ahead, now, and describe about this day: You told him you had a purchaser for the car, by the name of Mr. Jenkins? A. Well, I told him I had a purchaser for the car, by the name of Mr. Jenkins, and he told me to take the car. When I first seen him, it was in the office of the Federal Sash & Door Company. Well, the car wasn't in the garage of the Federal Sash & Door Company, it was up in Mr. Ross's garage—that is a partner of Mr. Rhoads, in the Federal Sash & Door Company, and I went up to Mr. Ross's house, and got the car out of the garage, and took this said car, the Mercer car, down to the Federal Sash & Door Company, in front of the Federal Sash & Door Company, and went in and asked Mr. Rhoads for some money for some gasoline, and which he gave me. . . .

"Q. Did he know to whom you were going to try to sell this car? A. No, sir.

"Q. Had you mentioned Mr. Jenkins's name to him? A. No, sir. . . .

"Q. Now, just what was said when he gave you the dollar to buy the gasoline with? A. Well, he told me—I told him I had a fellow I wanted to demonstrate the car to, and he gave me a dollar to buy some gasoline with, and he never told me any specified time when to demonstrate this car, because it was about four o'clock or a little after four when he gave me the money for the gasoline, and following that, why, Mr. Herbert Jenkins, the fellow I was going to demonstrate it to, he was going to come by my house that night.

"Q. Where did you live? A. 3236 Morrell Avenue.

"Q. And that was the place he [Jenkins] was to come by? A. Yes, sir, and which he come by, and he stopped and told me he

hadn't time to look at the car, but to bring the car out and show him the car, and—

"Q. (Interrupting): Now, where did he tell you to bring the car, to show it to him? A. I was going out to the Ross Farm—Colonel Ross Farm, a farm owned by Mr. Colonel Ross, and it is just about a half a mile south of where the accident occurred.

"Q. Well, did Mr. Jenkins say anything about seeing you out there in the country, in the morning? A. Yes, sir. I told him we had arranged before that time, I was going out there that night anyway, and so I told him I would bring the car out and show him the car.

"Q. And he wanted a demonstration out there—he wanted you to bring it out there to where he lived in the country, to demonstrate it out there to him? A. Yes, sir. Well, he just told me to come out there. I was coming out there, that way, anyway, and I was going out that night, and he told me to bring it out and he would look over it, and if it was worth the money, he would buy the car."

### CROSS-EXAMINATION.

"Q. Now, then, after you finished that work on the car, and between that time and the time, on May seventh, did you have the car out? A. Well, I had it out one or two times, to test—that is, to adjust the carburetor, and the bearings on the car.

"Q. That was to make the car work, in accordance with the arrangement you had made with Mr. Rhoads, when you started to work on it, is that it? A. Yes, sir.

"Q. You were simply making good under that one hundred dollar contract? A. Yes, sir, I was.

"Q. During those times, when you took the car out to see if the carburetor was working right, did you endeavor to demonstrate the car for sale purposes? A. Well, one time, yes, sir. It was Mr. Ross, Roland Ross, I demonstrated it to him, and let him look over the car, and see what he thought of the car.

"Q. Where was it he looked over it, what place? A. He looked over it in front of my place, 3236 Morrell Avenue.

"Q. Did you go out and ride with him? A. No, sir.

"Q. Was there anybody else to whom you demonstrated the car, between the time you had done this work on the car, and the time of this collision? A. Not that I know of—not to demonstrate. I know there was a lot of people I showed the car to, but I never did demonstrate it.

"Q. I see. Where did you show the car to them? A. Well, I had one party that looked at it, at the Federal Sash & Door Company.

"Q. I see. Now, Mr. Rhoads made you a price on the car, did he? A. Yes, sir.

"Q. And that price was seven hundred and fifty dollars? A. Yes, sir.

"Q. You were to have anything over and above seven hundred and fifty dollars, you could get for the car? A. Yes, sir.

"Q. You didn't have any agreement with Mr. Rhoads, that he was to pay you any commission out of the seven hundred and fifty? A. No.

"Q. Now, at the time you went to Mr. Rhoads, on this particular day, May seventh, you told him you had a prospect for the car? A. Yes, sir, I told him I had a prospect for the car, and I wanted to demonstrate the car.

"Q. He had already told you the price of the car was seven hundred and fifty dollars net to him, did he? A. Yes, sir, he said that is what he would take for it—seven hundred and fifty dollars.

"Q. And you didn't tell him, I believe you said, who the prospect was? A. No, sir. . . .

"Q. Had you ever before demonstrated this car to anybody, and driven your prospective purchaser around there in the car? A. No, sir.

"Q. And on all of these occasions, all of these other occasions, when you say you demonstrated the car, you simply showed the car to the parties? A. Yes, sir, I showed it. . . . . .

"Q. So, at the time you saw Mr. Rhoads about this matter, and you got the dollar for the gasoline, you were expecting Jenkins to come to your house that night, and you were expecting to make a demonstration to him when he came out, sometime, about six o'clock in the evening? A. Yes, sir.

"Q. Did you tell Mr. Rhoads anything about that? A. No, sir, I told him I wanted to make a demonstration; I never told him when or where or how.

"Q. And you didn't tell Mr. Rhoads that you would take the car out that night, take the car out at night? A. No, sir, I never told him.

"Q. (Continuing)—or that you would drive out to the Ross Farm? A. No, sir, I never told him when I was going to make the demonstration. . . .

"Q. Now then, after Jenkins came to your house, and looked over the car, and you made up your mind you would then go out and spend the night with the Ross boys, on the Ross Farm, did you get in touch with Mr. Rhoads, to tell him you were taking the car out there? A. No, sir, because I didn't think it was necessary, because he told me I could have the car out for a demonstration.

"Q. Then, if I understand you correctly, the substance of your conversation with Mr. Rhoads was that you could take and show this car, and that he would sell the car for seven hundred and fifty dollars net? A. Yes, sir.

"Q. (Continuing)—to him? A. Yes, sir.

"Q. (Continuing)—is that right? A. Yes, sir.

317 Mo. Sup.—37.

"Q. And was there any other price ever talked over between you and Mr. Rhoads? A. No, sir.

"Q. Seven hundred and fifty dollars was the price? A. Yes, sir.

"Q. And any compensation which you got out of the deal, was to be over seven hundred and fifty dollars? A. Yes, sir.

"Q. Mr. Rhoads didn't pay you anything for taking the car out and demonstrating it, did he? A. No, sir.

"Q. He didn't agree to pay you anything for taking the car out and demonstrating it? A. No, sir, because I fixed the car up and I knew that—

"Q. (Interrupting) Answer the question?

"Q. I say, he didn't agree to pay you anything for demonstrating the car? A. No, sir, but I thought he would give me something, if I would sell the car for seven hundred and fifty dollars, which was an exorbitant price for the machine which he had.

"Q. I understand, Mr. Johnson, but you have already testified what the agreement was: The agreement was, Mr. Rhoads was to have seven hundred and fifty dollars net, and you were to get your commission out of anything more you could sell the car for? A. Yes, sir.

"Q. Did you make any definite agreement with Mr. Rhoads at the time you got this, asked him for this dollar for gasoline? A. No, sir.

"Q. (Continuing)—as to how long you would work on selling the car? A. No, sir.

"Q. There was nothing in that agreement which would prevent you from turning the car back in the next ten minutes, if you wanted to, was there? A. Yes, sir—no, sir, there wasn't anything that would keep me from turning the car back in the next ten minutes, if I wanted to. Mr. Rhoads said if he wanted the car, I could give the car right back to him."

From the foregoing, and the evidence previously summarized, this clearly appears: The defendant had not employed Johnson to sell the car, he had not requested him to sell it. He had, however, told Johnson that he would sell the car for seven hundred and fifty dollars, and had agreed with Johnson that, if the latter could find a purchaser who would pay more than seven hundred and fifty dollars, Johnson could have the excess. To that extent, and that only, had he authorized Johnson to make a sale of the car. But the means and methods to be employed in finding a purchaser were left entirely to Johnson, they were of no concern whatever to defendant. Pursuant to that somewhat vague understanding, Johnson, on his own initiative and for his own purposes, obtained defendant's permission to take the car out to demonstrate it to a prospective buyer. If the evidence be considered as a whole, and not by isolated fragments, no other

conclusions can be reasonably drawn from it. Johnson was therefore *engaged in his own business, and not that of defendant's,* when he collided with plaintiff's car. It follows that defendant is not liable for the consequences of Johnson's negligent acts under the rule, *respondeat superior.* [Standard Oil Co. v. Anderson, 212 U. S. 215.]

The plaintiff recovered damages in the sum of $1,000 in the circuit court. The Kansas City Court of Appeals reversed the judgment, but deeming its decision to be in conflict with that of the Springfield Court of Appeals in the case of Borah v. Zoellner Motor Co., 257 S. W. 145, certified the cause here. We think the case at bar clearly distinguishable on the facts from the Borah case.

The judgment of the circuit court is reversed. All concur.