## THURMAN et al. v. CULBERSON et al.
(No. 2328.)

Court of Civil Appeals of Texas. El Paso. Dec. 12, 1929.

Rehearing Denied Dec. 19, 1929.

Davenport & Crain, of Wichita Falls, and Touchstone, Wight, Gormley & Price, of Dallas, for appellants.

Thompson & Barwise, of Fort Worth, and T. R. Boone and Fred Weeks, both of Wichita Falls (B. V. Thompson, of Fort Worth, of counsel), for appellees.

HIGGINS, J. Appellant Thurman was struck by an automobile owned by the Davidson-Hamilton Company, a partnership. The car was being driven by D. J. Cutbirth. At the time Thurman was an employee of the Times Publishing Company, a subscriber under the Workmen's Compensation Act (Rev. St. 1925, arts. 8306-8309, as amended); the Lumbermen's Reciprocal Association being the insurance carrier. Thurman recovered compensation from such carrier.

The present action is by Thurman and the Lumbermen's Reciprocal Association against the individuals composing the firm of Davidson-Hamilton Company to recover damages for personal injuries sustained by Thurman by being struck, by the car owned by said Company and driven by Cutbirth; the association seeking to recover the amount of compensation it had been compelled to pay Thurman. At the conclusion of the plaintiff's evidence, the defendants moved for an instructed verdict, which was granted.

The sole question presented by this appeal is whether Cutbirth, at the time of the accident, was acting as the servant or employee of the defendants, or as an independent contractor.

If Cutbirth was an independent contractor, the instructed verdict was proper; if he was a servant or employee of defendants, such verdict is improper, for, upon all other phases of the case, the evidence was such as to require submission to the jury. There is no dispute in the evidence upon the controlling question.

The Davidson-Hamilton Company were automobile dealers. The Auto Sales Company was a partnership composed of Cutbirth and one Blankenship. The places of business of the companies were two blocks apart. Henry Hamilton, one of the defendants, testified:

"I am one of the defendants in this case, and I am actively connected with the Davidson-Hamilton Company. I am in charge of the sales. I am acquainted with D. J. Cut-

birth. On or about January 30th of last year we had an agreement with Mr. Cutbirth, whereby he sold automobiles for us. We let him have certain cars to sell and he was free to sell them to whomsoever he could. He could not, however, execute bills of sale for the cars, unless it was a cash sale. Otherwise, he would have to come to us for the bill of sale. It is a part of our business, that is, of the Davidson-Hamilton Co. to sell used cars. It is necessary to sell them because we have to take them in when we sell new cars. When he sold one of our cars and took in a car the appraisal of that car was done by Mr. Cox and myself. We did not permit him to make an appraisal of cars that he took in on a sale. We did not rely on his judgment for the appraisal of cars, not even when we appraised the cars ourselves. We did not ask him what he thought a car was worth. He would suggest to us the car he wanted to take and sell, and we had the right to tell him he couldn't have a certain car. He had the right to keep a car a certain specified time, but we had the right to require him to bring the car back at any time we wanted it, or we could go get the car. He could take the cars out of town to sell them, but not take them on any trips. No, he would not have a right to take them to Fort Worth or Dallas to sell them.

"Other than what I have stated, he did not have a right to take them away except with our permission. The cars had gas and oil in them when they were turned over to him. These were used cars that he was selling. We reconditioned the car, if it needed it, before it was resold. That work was done in our own shop, and they were supposed to be ready to sell.

"If a car broke down while he was driving it, conditions would govern as to who was to repair it. If the car needed repairs and he was not responsible for its condition, it was up to us to fix it and put it in first-class condition. It was not his responsibility to keep the car in condition other than to use ordinary care about not tearing it up. If he failed to take proper care of a car while he had it, then it would be up to him to fix it up. We would not permit him to run our cars without oil or water if we knew it. I would not let him do it if I knew it.

"If we knew he was not taking proper care of the car we had the right to get it from him at any time and terminate our relations with him. In the event he sold a car on time he could not execute a bill of sale to it.

"We reserved the right to turn the purchaser down if he was not suitable. When we turned a car over to him to sell we told him how much he was to get for it and he had no right to make different terms. If he had agreed to sell a car to a prospect on our terms, we could turn the deal down if the prospect did not suit us. Mr. Cutbirth had no right to take these cars out and use them for his own personal use, for pleasure or business.

"If he had been using the cars for his own personal use we could have taken them away from him. He had no right to hire or loan them to anybody, nor to haul passengers in them. I let him use his own judgment about turning the cars over to his prospects for two or three days to drive them. We had the right to get the car from the prospect he had turned it over to, if we wanted the car.

"We would not telephone him to see certain prospects. We have regular salesmen employed. If one of our salesmen was trying to sell the same car that Mr. Cutbirth was selling, we reserved the right to give the sale to our regular salesman. He had no right to bother a prospect which the regular salesman was dealing with. We had the right to go to his prospects if we wanted to and sell him a car, we reserved that right.

"It is a part of the business of the Davidson-Hamilton Company to sell used cars. The car Mr. Cutbirth was driving when he struck Mr. Thurman belonged to us, and it was a Ford. * * *

"They (referring to Blankenship and Cutbirth) have an office and a telephone and some one in the office besides Blankenship and Cutbirth, and did have at that time. They sold other person's cars in addition to the ones we let them have. At the time in question I had 7 or 8 salesmen selling cars for us and they were under my control. They were working on a salary and commission. I had authority to direct their movements, with reference to where they went and who they saw.

"I have had dealings with the Auto Sales Company. I have let them have several used cars to sell. I don't know as I could say just what kind of cars I have let them have, but I have let them have Fords and Chryslers, and any other cars that we may have had for sale. I have made trades with three different people at the Auto Sales Company, with Cutbirth, Blankenship and their office man.

"When they came and got a car the price was stated what it was to be sold for. We fixed the price ourselves. They did not have a right to come in at any time and pick out a car without our permission. They did not have the right to lower the price and sell the car for less than the price we had placed on it. If they sold a car for cash we had nothing to do with the deal or who it was sold to. When they sold a car on terms, we checked up on the purchaser and if his credit was good we accepted the deal, but I reserved the right to turn the deal down.

"They were to get ten per cent. of the amount paid when they sold a car, and if they made no sale they were not to receive anything. They did not bring a car back every night when they had one of our cars; they kept it at their place of business. They furnished the oil and gas after they took the car

from us, and they were to pay for any damage to the cars in event they had an accident. We did not have any right or reserve any right to tell them who to sell the cars to.

"We did not tell him whether he could demonstrate the cars in the daytime or nighttime; we had no control over the hours he worked. He did not make any report as to how much he was working on a deal. I would not see the car from the time he took it from our place until he brought it back. * * *

"I had no control over him as to how he should demonstrate this car at any time, nor the road he was to travel, or the street. I did not know where he was at any time, except within the vicinity of Wichita Falls. I never at any time told him of a prospect. I usually gave them to my own salesmen. I never suggested to the Auto Sales Company who to try to sell a car to, at any time. I have no interest in that Company, and I have never been connected with it.

"We have never paid Mr. Cutbirth or his firm any salary. I never told them how fast they should drive a car down the street. The Davidson-Hamilton Company is not in any way connected with the Auto Sales Company, and the Auto Sales Company has no interest in the Davidson-Hamilton Company.

"My concern does not sell cars for the general public. All we have to do with the Auto Sales Company is to pass on the financial responsibility of the purchasers when they sell one of our cars, and to execute bills of sale when a car is sold on terms. When they took one of our cars to sell it was the practice and custom to allow them a reasonable time within which to sell it, and when they returned the cars to us they were supposed to be in as good condition as they were when they got them. If anything happened to the car while it was in their possession they were supposed to fix it up in good condition. I did not have any car fixed that they had repaired in any way.

"Yes, it was our custom to let Mr. Cutbirth have these cars for two or three days, but regardless of what our custom was, we had the right to require him to bring the car back in fifteen minutes. We did not have a right to tell whom to go and see about buying a car."

Cutbirth testified:

"On the 30th of January of last year I had a Ford sedan belonging to the Hamilton-Davidson Company that I was trying to sell, and about 7 p. m. that evening I had an accident with this car. I was driving this car at the time I struck Mr. Thurman. Just prior to the accident I had been at 2104 Taylor street to sell the car to a prospective buyer, and at the time of the accident in question I was returning to town with the car. The prospect was with me in the car at the time of the accident. * * *

"We conduct a used car business, buying and selling used cars, and selling used cars on consignment, commission. Occasionally I bought and sold used cars. Mr. M. T. Blankenship was my partner in the business. We went under the name of the Auto Sales Company, and we had a sign out to that effect. * * *

"With reference to our actions in the sale of cars, if it was a car that belonged to us we had complete charge of it; if it belonged to some one else they had charge of it, as to whether or not the car would be sold to certain parties.

"We handle cars on consignment and sell them on a commission basis. At the time of this accident we were selling some cars for the Davidson-Hamilton Company and Dixon Motor Company and the general public. * * *

"I had gotten some cars from the Davidson-Hamilton Company on consignment previous to the time of this accident. By consignment, I would take the car and sell it on a commission, the regular way of used cars being sold by used car dealers. When I took the car to sell it on a commission the Davidson-Hamilton Company had nothing to do with who I sold it to or to whom I demonstrated the car. I would demonstrate the car to whomsoever I desired. I could employ an assistant to demonstrate these cars and help me sell them.

"I never rendered the company a bill for the cars except the necessary repair bills to enable me to sell them, in other words, to put the car in saleable condition. If a car was defective when it was consigned to me it was up to them to fix it. Other than defects in a car to recondition it I paid all the other expenses of the car while I had it in my possession, in the sale of the car, and I handled it to suit myself and showed the car to whomsoever I pleased.

"I had no regular hours to report to the Davidson-Hamilton Company. I did not have to report to them what I was doing with the car, and they did not have any right to ask me what I was doing with the car while I was demonstrating it. I had exclusive control over the car with respect to who I demonstrated it to and the time I would demonstrate it. Ordinarily, I could demonstrate it day and night. They had no right to tell me I could only demonstrate the car in the daytime, or nighttime. I used my own judgment and method in the manner in which I demonstrated the car. I considered I had that right exclusively. They had a right to tell me how I demonstrated the car, and not abuse it, and the car was their property until it was sold.

"I was to keep the car and if it was not sold to return it to them in as good condition as it was when I got it. If the car needed gas and oil while it was in my possession I bought it and paid for that myself, and that was not supposed to be paid by the Davidson-Hamilton Company.

"The Auto Sales Company was responsible for the car during the time we had it and for any fuel it took to run the car, or to any damage done to the car while demonstrating it, if we were responsible for it. I got my profits from the Auto Sales Company after paying the expenses of the concern. If the company didn't make any money I didn't get any. If I sold a car and received ten per cent. commission it went to the Auto Sales Company. The check was made payable to the Auto Sales Company. We split the profits, but not necessarily at the end of the month. If we needed some money during the month we got it.

"My Company was entirely separate and independent from the Davidson-Hamilton Company; they had nothing to do with directing the details as to how we conducted our business. The only right they reserved was to pass upon the credit of the man we sold the cars to. If we sold a car for cash they had nothing on earth to do or say with us except to execute the bill of sale."

It would be useless for us to quote the general rules announced by the courts of this state which govern in determining the question of whether one is to be regarded as an independent contractor or the servant or employee of another.

These rules and definitions were considered by Justice German of the Commission of Appeals in Shannon v. Western Indemnity Company, 257 S. W. 522, 524, and his conclusion is thus stated:

"From this classification it will be seen that the outstanding quality of any contract, as touching the question of the independence of same, and which is ultimately the one most decisive of the question, is the one of the right of control of the person employed by the employer with respect to the details of the work. All other elements bear some relation to that one, and directly or indirectly indicate the presence or the absence of the right of control. For this reason it has often been said that the supreme test of the relation is the right to control. So it may be stated in a general way that in every contract of employment, this element of right to control being present, the person employed has been held to be an employé or servant, unless all the other circumstances necessarily required a different conclusion; and when this element of control was absent, the person has been held to be a contractor, and not an employé unless a contrary conclusion was apparent from all the other circumstances."

Briefly stated, the facts in the present case show that Davidson-Hamilton Company was a firm selling automobiles, some of which were secondhand cars. The Auto Sales Company were dealers in secondhand cars, selling cars belonging to others upon a commission basis. The two companies were separate and distinct. From the evidence quoted it seems to us that, at the time Cutbirth was driving the car which struck Thurman, he was engaged in his own business of selling cars, making an effort to sell the car belonging to the Davidson-Hamilton Company as he was authorized to do, and, since the Davidson-Hamilton Company had reserved no right whatever to control him with respect to the details of the work of selling the car, Cutbirth is properly to be regarded as an independent contractor and not a servant or employee of defendants.

No case has been cited, nor have we found any, directly in point upon the facts, but the conclusion reached is, we think, supported by the following: Bell v. State, 153 Md. 333, 138 A. 227, 58 A. L. R. 1051; Horn v. Rhoads, 317 Mo. 572, 296 S. W. 389; Goodrich v. Musgrave F. & A. Co., 154 Iowa, 637, 135 N. W. 58.

We are therefore of the opinion the verdict was properly directed.

Affirmed.