THE BANK OF NOVA SCOTIA, demandante y recurrente, *v.* GREGORIO VÉLEZ RULLÁN, demandado y recurrido.

*Número:* CE-64-12      *Resuelto:* 17 de noviembre de 1964

*Brown, Newsom, Córdova & Díaz,* abogados del recurrente; *Jorge Marín Báez,* abogado del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

El recurrente, The Bank of Nova Scotia, demandó al recurrido, Gregorio Vélez Rullán, en cobro de la suma de $1,970, más intereses por concepto de dos giros expedidos por Ramón L. Soldevila Ferrer contra el recurrido, en julio y agosto de 1957, alegando que el recurrente es el tenedor de los mismos, que fueron aceptados por el recurrido y que éste se negó a pagarlos. Al dorso de ambos giros aparece el nombre de Gregorio Vélez Rullán, debajo la firma de Francisco Laguna, luego un impreso que dice "Pay to the order of The Bank of Nova Scotia for Value Received" y más abajo la firma de Soldevila Ferrer. Al ser presentados para su pago, el recurrido se negó a satisfacer su importe y escribió al dorso de uno de los giros la frase "no le debo nada a este Sr.", y firmó su nombre debajo de este escrito. El recurrido negó los hechos alegados en la demanda excepto que se le requirió de pago de los referidos instrumentos y no los había pagado al recurrente "porque nada debe al demandante." El Tribunal de Distrito, Sala de Utuado, declaró sin lugar la demanda y al efecto concluyó que el recurrido no había firmado personalmente los giros aceptándolos y que Laguna nunca recibió mandato, autorización u orden para firmar por el recurrido, siendo las relaciones de ambas partes contratantes las que surgen de un contrato de acarreo o transporte de harina; que Laguna fue inducido a firmar y poner el nombre del recurrido en los referidos giros como requisito previo para que se le entregara la harina, creyendo Laguna que lo que firmaba era un "conduce" para poder transportar la harina y jamás una obligación, por no tener mandato ni expreso ni tácito, ni por conducta; que el demandado nada le

debe al banco ni a Soldevila por concepto de compraventa de harina; y por último, que de la faz de los giros aparece la nulidad absoluta de los mismos por lo que el demandante no es un tenedor de buena fe, citando en apoyo de esta última conclusión los Arts. 354, 368, 371, 416, 418, 479 y 480 del Código de Comercio en vigor. En apelación, el Tribunal Superior, Sala de Arecibo, confirmó la sentencia por la razón de que las conclusiones a que llegara el tribunal a quo estaban ampliamente sostenidas por la prueba que tuvo ante su consideración.

En su petición de *certiorari*, el recurrente apunta que el Tribunal Superior incurrió en error al confirmar la sentencia del Tribunal de Distrito en la que éste erró al no aplicar a este caso las disposiciones de los Arts. 1601 del Código Civil y 376 del Código de Comercio y al no revocar dicha sentencia y ordenar un nuevo juicio por no haberse podido transcribir el testimonio de uno de los testigos más importantes y, por último, al condenarse al recurrente a pagar honorarios de abogado y en caso que procedieran, al imponerlos en la suma que lo hizo.

Con el fin de sostener su contención, alega el Banco recurrente que es tenedor de buena fe de los giros en cuestión, pues cumple con los requisitos del Art. 405 del Código de Comercio (19 L.P.R.A. sec. 92).(¹) Aunque admite que esta calidad de tenedor de nada le valdría si de hecho los instrumentos en cuestión fueron firmados por Laguna sin autorización, sostiene que de las relaciones y actuaciones de las par-

---

(¹) El Art. 405 del Código de Comercio dispone:

"Tenedor de buena fe es el que ha tomado el documento con arreglo a las siguientes circunstancias:

(1) Que esté completo y sea regular en su apariencia;

(2) Que se convirtió en tenedor del mismo antes de estar vencido, y sin tener conocimiento de que su aceptación o pago había sido rehusado previamente, si ése fuere el caso;

(3) Que lo tomó de buena fe y por causa onerosa;

(4) Que cuando le fue negociado no tenía conocimiento alguno en el documento, o en el derecho de la persona que lo negoció."

tes debe, razonablemente concluirse e inferirse que la autorización tácita que contempla el Art. 1601 del Código Civil en vigor (31 L.P.R.A. sec. 4422) existía en este caso. Además, asumiendo que Laguna se hubiera excedido en las facultades que el recurrido le confirió, éste está obligado a honrar los referidos dos giros porque está impedido de levantar la falta de autorización y porque al recibir la harina y usarla ratificó tácitamente lo hecho por su mandatario Laguna.

Por el contrario, alega el recurrido que los giros son "nulos de toda nulidad" porque el recurrido no los firmó y por lo tanto no pueden ser susceptibles de confirmación tácita o expresa; que aunque fuera válido el documento "todavía el demandado [aquí recurrido] no sería responsable y sí los que hacen el endoso en el pagaré", según lo dispuesto en los Arts. 371, 373 y 376 del Código de Comercio (19 L.P.R.A. secs. 19, 21 y 24) ; que el recurrente no es un tenedor de buena fe porque la nulidad de los giros aparece de su propia faz.

Inicialmente debemos resolver si los giros en cuestión eran válidos y por lo tanto si el recurrente como tenedor de los mismos era o no era un tenedor de buena fe y luego determinar, en caso que lo fuera, si procedía o no la defensa de falta de autorización.

Todo tenedor será considerado, *prima facie,* como tenedor de buena fe; pero cuando se probare que era defectuoso el título de la persona que ha negociado el documento, el peso de la prueba recaerá sobre el tenedor para justificar que él o la persona de quien hubiere derivado su título adquirió éste en concepto de tenedor de buena fe. Art. 412 del Código de Comercio (19 L.P.R.A. sec. 99).

Si bien es verdad que la aceptación no está firmada por el propio librado como dispone el Art. 485 del Código de Comercio (19 L.P.R.A. sec. 241), [2] la misma podía firmarse

[2] El Art. 485 del Código de Comercio lee así:

"La aceptación de una letra significa el asentimiento del librado a la orden del librador. La aceptación se hará por escrito y estará firmada por el librado. No podrá expresar que éste habrá de cumplir su obligación por otro medio que no sea el pago en dinero."

por un agente debidamente autorizado y esta autorización se puede probar del mismo modo que en otros casos de mandato, según el Art. 372 del Código de Comercio (19 L.P.R.A. sec. 20).(3) No es esencial, a los fines de la regularidad de la aceptación en este caso, que la autoridad de Laguna para firmar los giros apareciese de la faz de éstos. *Wegener* v. *Emmetaburg Nat. Bank*, 193 N.W. 627, 631 (Ia. 1923) ; *Pennover* v. *Dubois State Bank*, 249 Pac. 795 (Wy. 1926). La existencia de la autoridad en cuestión puede deducirse del curso de las negociaciones aunque no hubiere una autorización específica. Bentel's *Brannan Negotiable Instruments Law*, 7th ed. pág. 410. La presunción de que los giros eran genuinos incluye la presunción de que el agente tenía autoridad para endosar (en este caso para aceptar). *Dean* v. *Falton*, 266 Pac. 236 (Ore. 1928).

██ Si se hubieren firmado por un agente sin autorización no tendrá efecto, ni se adquirirá en virtud de tal firma derecho alguno para obligar al pago de estos giros, a menos que el librado aquí recurrido estuviere impedido de alegar en su defensa la falta de tal autorización. Art. 376 del Código de Comercio (19 L.P.R.A. sec. 24).(4) El término "impedido" según se usa en el Art. 376 del Código de Comercio incluye no tan sólo el "estoppel" sino también la ratificación en casos de actuaciones en exceso de, o sin previa autorización. *Chemical Corn Exchange Bank & Trust Co.* v.

---

(3) El Art. 372 del Código de Comercio provee que:

"Cualquier agente debidamente autorizado, podrá firmar a nombre de otra persona. Para ese fin no será necesaria ninguna forma especial de mandato; y la autorización que tenga el agente se podrá probar del mismo modo que en otros casos de mandato."

(4) El Art. 376 del Código de Comercio dice:

"Cuando se falsificare una firma o se hiciere sin autorización de la persona de quien se supone que procede la firma, no tendrá efecto alguno, ni se adquirirá en virtud de ella, derecho alguno para retener el documento o para cancelarlo o para obligar al pago del mismo a cualquiera de las partes que en él figuren, a menos que la parte contra quien se tratare de hacer valer tal derecho estuviere impedido para alegar en su defensa la falsedad o falta de autorización."

*Frankel,* 111 So.2d 99 (Flo. 1959); *Johnson* v. *Crown Finance Corp.,* 22 S.W.2d 525 (Mo. 1949); *Strader* v. *Haley,* 12 N.W.2d 608 (Minn. 1943), 150 A.L.R. 970; Britton, *Bills & Notes,* 2d ed., sec. 128, pág. 343; Bentel's *Brannan Negotiable Instruments Law,* supra.

El Art. 1601 del Código Civil (31 L.P.R.A. sec. 4422), dispone que el mandato puede ser expreso o tácito, que no es necesaria ninguna forma especial, que puede ser de palabra y que la aceptación tácita puede deducirse de la conducta del mandatario. El Art. 1618 del referido Código (31 L.P.R.A. 4461), dispone que en lo que el mandatario se haya excedido, no queda obligado el mandante sino cuando lo ratifica expresa o tácitamente. El Art. 548 del Código de Comercio (19 L.P.R.A. sec. 386), dispone que en los casos no previstos por las disposiciones del Código relativas a instrumentos negociables regirán las reglas de derecho mercantil, civil y de equidad.

■ La existencia de autorización puede deducirse de los actos del poderdante, de actos o hechos que palmariamente revelan aquella declaración de voluntad que implique necesariamente de modo evidente y palmario la intención de obligarse. Si después de una determinada situación de hechos se crea un mandato bien puede entenderse que si en el futuro el mandante crea una situación análoga quiere dar vida a un nuevo mandato. Cuando una persona ha sido investida con autorización aparente y tenida para con el público por el poderdante como su agente, esto es suficiente para probar la existencia de la agencia. Cuando se concede autorización para realizar ciertas gestiones puede existir autorización implícita para realizar determinados actos necesarios para llevarlas a cabo o que quedan incluidos dentro de las gestiones encomendadas. *Torres* v. *P.R. Racing Corporation,* 40 D.P.R. 441 (1930); *Pereles* v. *Ongay Garage & Radio Co.,* 60 D.P.R. 8, 12 (1942); *National City Bank* v. *Del Moral,* 46 D.P.R. 648 (1934); *Vivaldi & Arbona* v. *Registrador,* 36 D.P.R. 552

(1927); *Bello et al.* v. *El Registrador de Arecibo*, 31 D.P.R. 118 (1922); *Reyes* v. *Palerm*, 29 D.P.R. 760 (1921); Sentencia del Tribunal Supremo de España de 21 de mayo de 1924; Scaevola, *Código Civil* T. XXVI, Vol. I, págs. 655–656.

■ La ratificación de un mandato puede ser tácita como en el caso en que el supuesto poderdante retiene y se aprovecha de los beneficios de la transacción que se llevó a cabo sin autorización o en exceso de ésta. Pero en este caso es indispensable demostrar que tal retención o aprovechamiento se hizo con pleno conocimiento de lo realizado por el supuesto mandatario y de las condiciones del negocio. *Lókpez* v. *Lókpez*, 64 D.P.R. 684, 691 (1945); *Loíza Sugar Co.* v. *Zequeira*, 63 D.P.R. 864, 869 (1944); *Dooley* v. *Pantoja*, 61 D.P.R. 642 (1943); *Gutiérrez* v. *Bustelo*, 15 D.P.R. 243, 246, (1909); *Goenaga* v. *Goenaga*, 15 D.P.R. 546, 555 (1909); Sentencias del Tribunal Supremo de España de 5 de abril de 1950,[5] 25 de junio de 1946,[6] marzo 3 de 1942,[7] 6 de abril de 1934,[8] 17 de junio de 1920,[9] 13 de marzo de 1913, [10] y 8 de julio de 1903.[11] Scaevola, *Código Civil*, T. XXVI, Vol. II, págs. 500–501. En *Newco Land Co.* v. *Martin*, 213 S.W.2d 504 (Mo. 1948), se dijo que "El mero hecho que el principal ha recibido o gozado de los beneficios de un acto no autorizado lo constituye una ratificación si la hizo sin conocer los hechos; ni constituirá una ratificación tal retención de beneficios luego de conocerse los hechos cuando al conocerse y sin su culpa las circunstancias son tales que no puede colocarse en el status quo o que no puede repudiar toda la transacción sin sufrir una pérdida." Véanse, además, *J.R. Watkins Company* v. *Vangew*, 116 N.W.2d 641 (N.D.

[5] III Jurisp. Civil, Tomo 30, pág. 625.
[6] III Jurisp. Civil, Tomo 15, pág. 363.
[7] Aranzadi, *Repertorio de Jurisp.*, Tomo IX, pág. 178, Sent. Núm. 315.
[8] III Jurisp. Civil, Tomo 213, pág. 406.
[9] 150 Jurisp. Civil, págs. 623–633.
[10] 126 Jurisp. Civil, pág. 622.
[11] 96 Jurisp. Civil, pág. 123.

1962); *Karetzkis* v. *Cosmopolitan National Bank,* 186 N.E. 2d 72 (Ill. 1962); *Taylor* v. *Connell,* 345 S.W.2d 4 (Ark. 1961); *Yarnall* v. *Yorkshire Worsted Mills,* 87 A.2d 192 (Pa. 1952).

■ Para que pueda haber el impedimento a que se refiere el Art. 376 del Código de Comercio por razón de "estoppel" en un caso como éste, es necesario demostrar que la conducta del recurrido indujo al recurrente a variar su posición y a actuar en su perjuicio como consecuencia de tales actos. *Pereles,* supra.

■ En *Quevedo* v. *Sucesión Pino,* 15 D.P.R. 686 (1909), en que se trataba de probar un mandato, sentamos la doctrina al efecto de que cuando la prueba de la existencia de un mandato es contradictoria "corresponde al tribunal que conocía del caso sin jurado alguno, resolver respecto a la credibilidad de los testigos y deducir la conclusión de hecho de acuerdo con la preponderancia de la prueba." En tales situaciones "estaremos muy poco inducidos a desatender las conclusiones a que llegara el tribunal sentenciador. . . ."

■ Resulta evidente de lo expuesto que los giros en cuestión eran válidos cuando los descontó el recurrente y que éste era, *prima facie,* un tenedor de buena fe de los mismos, sujeto a la defensa de falta de autorización de Laguna para aceptarlos a nombre del recurrido. La cuestión, por lo tanto, se reduce a determinar de la prueba si Laguna estaba o no autorizado a aceptar los giros a nombre del recurrido, y si no lo estaba, expresa o tácitamente, si el recurrido estaba o no estaba impedido de alegar la defensa de tal falta de autorización.

La prueba demuestra que (1) el recurrente recibió los dos giros de manos del librador con aceptación en los mismos firmados por Laguna a nombre del recurrido; (2) los descontó antes de su vencimiento; (3) de su faz no aparecía defecto alguno; (4) los envió a un corresponsal en Utuado para su cobro; (5) se presentaron al recurrido para su cobro;

y (6) éste no los pagó porque "no debía nada al Sr. Solde-
vila Ferrer [el librador]".

El testigo Alvarado, anterior empleado a cargo de la
oficina del librador (Soldevila) de los giros y que para la
fecha en que se libraron los giros "solamente tenía que ver
con la venta de harina", declaró que el recurrido compraba
harina de Soldevila Ferrer a crédito a través del testigo;
que a esos efectos el recurrido tenía establecida una cuenta
corriente en la oficina de Soldevila; que cuando se le vendía
al recurrido una partida de harina, "a pesar de que estaba
establecida una cuenta corriente y eso se le cargaba en cré-
dito, entonces el Sr. Vélez Rullán [el recurrido] le firmaba
giros para con esos giros levantar fondos en el Banco, por-
que el giro del Molino a que se compraba la harina había
que pagarlo y entonces mandarle la harina al Sr. Vélez
Rullán"; que no había requisito indispensable para entre-
garle mercancía al Sr. Gregorio Vélez Rullán porque el
Sr. Vélez Rullán gozaba de buen crédito y de una confianza
absoluta en la oficina y que "únicamente cuando la oficina no
tenía harina disponible pagada ya en Banco, o no tenía fondos
para pagar giros del Sr. Vélez Rullán, para levantar los
fondos, no era requisito indispensable el que el Sr. Vélez
firmara giros para mandarle harina porque si había harina
disponible no tenía que firmar ningún giro porque tenía
establecida una cuenta corriente; que cuando el Sr. Vélez
Rullán no podía ir todos los días a San Juan, tenía giros
firmados en blanco en la oficina"; que conocía la firma de
Laguna "porque varias veces le tomó la firma en el conduce
de la mercancía". Declaró que "es posible que el Sr. Laguna
firmara los giros porque quizás en otros surgió lo mismo y el
Sr. Laguna firmó los giros . . . que generalmente los carreros
firmaban giros y que en ocasiones como esa para no dejar de
darle servicio al cliente se supone que le cogieron la firma
en el giro." A la pregunta si era norma del negocio obtener
firmas de personas sin autoridad para ello para con esas

firmas no autorizadas ir a un banco y obtener dinero, contestó Alvarado que "en este caso específico . . . se le tomaron en la oficina la firma al Sr. Laguna porque se sabía que era una persona de absoluta confianza para el Sr. Vélez Rullán. Que es verdad que el Sr. Vélez Rullán nunca se querelló de las firmas." Añadió "que yo recuerde el Sr. Vélez no pagó giros sin [sic] en el Banco, porque los giros los pagaba la oficina a su vencimiento con un cheque de la oficina"; que "él [refiriéndose al recurrido] me daba cheques para su abono en su cuenta corriente, entonces la oficina pagaba esos giros al Banco no con el dinero que él daba, sino que se abonaba a su cuenta y entonces se mandaba al Banco en remesas y luego la oficina hacía el cheque y pagaba esos giros." Más adelante declaró: "Aquí viene una aclaración muy importante que es la siguiente: No siempre se firmaban en la oficina era para entregar harina, no siempre que se hacían giros en la oficina para descontar era para entregar harina, porque cuando había harina sobrante que ya se había pagado por el representante, la misma oficina le daba al cliente esa harina sin hacerle giro y se le cargaba a su cuenta corriente, entonces después, si se venció un giro de ese cliente y no había en la oficina dinero para pagarlo, entonces se hacía un giro contra ese cliente, se descontaba en el banco y se pagaba el giro que se vencía, así que no siempre era para entregar harina los giros que se hacían." Que "el Sr. Vélez Rullán le firmaba giros a Soldevila para levantar fondos en el banco y no eran para llevar harina específicamente."

Por último declaró: "Tengo entendido que de acuerdo con la cuenta corriente que se le pasó al Sr. Vélez Rullán una cuenta detallada, tengo entendido que hay un balance deudor del Sr. Vélez Rullán y a favor del Sr. Soldevila pero que en este momento no tiene la seguridad de la cantidad y que posiblemente pase de $1,000.00".

El recurrido Sr. Vélez Rullán testificó que todos sus negocios con la firma de Soldevila Ferrer los realizaba a través de

su representante Sr. Alvarado; que este negocio consistía de la compra de harina; que compraba la harina a través de facturas, le mandaban la factura y él enviaba un cheque; que en algunas ocasiones firmó giros, que el propósito era para levantar fondos; que su relación con Laguna era de que Laguna le cargaba la harina; que el Sr. Laguna iba personalmente a buscar la harina, pero no sabe quién se la entregaba al Sr. Laguna; que los dos giros del caso le fueron presentados al cobro, no recuerda la fecha, pero ya para esa fecha le había saldado la cuenta a Soldevila a través del Sr. Alvarado. Que la razón que dio para no pagar los giros era que no debía nada al Sr. Soldevila Ferrer; que al Banco no se le pagó y sí al Sr. Soldevila Ferrer a través del Sr. Alvarado.

Francisco Laguna declaró que iba a buscar mercancía para el recurrido en distintas ocasiones; que firmó unos documentos (giros) en este caso; que Alvarado le dijo que eran unos "conduces". Que fue a buscar harina por orden del recurrido, la trajo a la panadería de éste y se la entregó; que tenía instrucciones del recurrido para traer la mercancía "pero que firmó como 'conduce', como le dijo Alvarado". Que fue la única vez que Alvarado le dijo que firmara así, de otra manera daba orden para el muelle. Que en el muelle, por ejemplo, si se iba a levantar la mercancía él firmaba el nombre de Francisco Laguna, el dependiente ponía el nombre de Vélez Rullán. Que en dos ocasiones en que fue a recoger harina para el recurrido, Alvarado le dijo: "Fírmate aquí para que te lleves esa harina". Se refiere a las dos veces en que firmó los giros en cuestión.

No hay duda que la relación del caso realizada por el juez sentenciador es incompleta. No tan sólo no incluye una relación del testimonio del librador de los dos giros en cuestión, Soldevila Ferrer, "por no poderse transcribir pero se elevará con demás cintas y expedientes del caso" sino que no aparece este testimonio en las cintas magnetofónicas unidas al expediente. Tampoco aparecen de la referida relación, las cir-

cunstancias que dieron lugar a la admisión del Exhibit F del recurrente que consistió de un giro librado por Soldevila contra el recurrido, en diciembre de 1952, al dorso del cual aparece el nombre del recurrido en tinta (pero no el nombre de Laguna) en letra parecida a la de Laguna que firmó el Exhibit G, y debajo de esta firma el endoso firmado por Soldevila a la orden del recurrente y el sello del recurrente al efecto de haberse puesto el giro al cobro.

El juicio de este caso se terminó de ver por el Tribunal de Distrito, Sala de Utuado, en 12 de junio de 1959. Se dictó sentencia en 15 de ·enero de 1960. Se apeló de la misma el día 26 de ese mismo mes y no fue hasta el 31 de marzo de 1963 que se terminó la relación del caso. Ya en 8 de noviembre de 1959 había muerto Soldevila Ferrer. Indudablemente que esta inusitada dilación en preparar la relación del caso ha dado lugar a las referidas omisiones en la misma. Para suplirlas el recurrente debió ofrecer una versión de la declaración de Soldevila y otras aclaraciones pertinentes y gestionar su aprobación por el tribunal sentenciador. En esta forma disponemos de la imputación de error basada en la ausencia del testimonio de un testigo en el récord del caso.

Del resumen que hemos hecho de la prueba, es evidente que:

(1) El recurrido compraba harina de Soldevila a través de Alvarado y usualmente el monto de cada partida se le cargaba a su cuenta corriente y el monto de cada compra lo pagaba el recurrido por cheque al recibir la factura.

(2) A esos efectos, el recurrido contrataba los servicios de Laguna para recoger dicho producto y transportarlo del almacén o muelle en San Juan a la panadería del recurrido en Utuado.

(3) Corrientemente para poder recibir la harina Laguna tenía que firmar un "conduce" o recibo de acuerdo con las prácticas en ese tipo de negocio de manera que puede concluirse que tenía autorización, por lo menos implícita, para esos fines.

(4) El recurrido aceptaba giros de Soldevila luego de recibida la harina, y en ocasiones para recibirla, pero en todos estos casos de giros él pagaba las facturas de harina en la oficina de Soldevila, y ésta entonces pagaba los giros en el banco.

(5) Es posible que Laguna firmara giros en otras ocasiones y que en los dos giros en cuestión se le tomó la firma a Laguna porque "se sabía que era una persona de absoluta confianza para el Sr. Vélez Rullán".

(6) No se ofreció prueba de que antes de, o al entregar la harina correspondiente a los dos giros que Laguna aceptó a nombre del recurrido, éste tuviese conocimiento de la referida aceptación.

(7) Hubo prueba de que el recurrido pagó a Soldevila, a través de Alvarado, las facturas cubiertas por los giros en cuestión.

(8) El tercer giro presentado en evidencia es de cinco años antes a los dos giros en que se basa la causa de acción en este caso, y no se probó definitivamente si la firma del nombre del recurrido, al dorso del documento la escribió él o Laguna, y si el recurrente recibió el monto del mismo del recurrido, o de la oficina de Soldevila, según la práctica establecida de dicha oficina.

A la luz de esta prueba, no podemos concluir que el tribunal sentenciador incurrió en error al concluir que Laguna no gozaba de autorización implícita para firmar los giros en cuestión, o al no concluir que el recurrido estaba impedido de impugnar la autorización de Laguna para aceptar los giros a su nombre, pues al aceptar y retener el recurrido la harina en cuestión no tenía conocimiento de la aceptación de los referidos giros ni realizó acto alguno que indujese al recurrente a descontar los giros y a variar su posición.

*En vista de lo expuesto, se confirmará la sentencia del Tribunal Superior, Sala de Arecibo, que a su vez confirma la del Tribunal de Distrito, Sala de Utuado, rebajándose la condena de honorarios de abogado a la suma de $250.*