Marcial Escobar Galarza, por sí y en representación como padre con patria potestad de los menores David, Melvin y Sonia M., todos de apellidos Escobar Trinidad, demandantes y recurridos, v. Juan R. Banuchi Pons, h/n/c Farmacia Banuchi y Otros, demandados y recurrentes.

*Número:* R-82-448          *Resuelto:* 28 de marzo de 1983

*Amancio Arias Guardiola,* de *Arias Cestero & Arias Guardiola,* abogado de los recurrentes; *Carlos Roberto Vélez,* abogado de los recurridos.

## SENTENCIA

En el presente caso expedimos orden para mostrar causa, limitada exclusivamente a la modificación o eliminación de las partidas concedidas por concepto de daños y perjuicios objeto del quinto al octavo señalamiento de error.

Oportunamente compareció la recurrida a exponer sus objeciones a la modificación de las partidas objeto de la presentación de causa. Luego de considerar sus argumentos, disponemos.

1. Debe eliminarse la partida de $10,000 concedida por el tribunal de instancia a los herederos de la occisa por concepto de los supuestos daños y perjuicios sufridos por ésta desde que fue objeto del disparo fatal y al instante de su muerte, porque no hay prueba alguna para sustentar la misma.

2. La partida de $95,000 concedida al recurrido Marcial Escobar Galarza por la pérdida de su esposa y el consorcio debe reducirse a la cantidad de $50,000.

3. Tomando en consideración que la occisa era una empleada ocasional a tiempo parcial, consideramos razonable como reparación de daños por concepto de lucro cesante

una partida de $45,000. A estos efectos, se modifica la partida que concedió el tribunal de instancia por este concepto.

Se expide el auto y se dicta sentencia para modificar la recurrida en los términos antes expresados. Así modificada, se confirma.

Así lo pronunció y manda el Tribunal y certifica la Secretaria. El Juez Asociado Señor Irizarry Yunqué, disiente de la parte de la sentencia que reduce a $50,000 la indemnización concedida al señor Escobar Galarza por la pérdida de su esposa y madre de dos niños de corta edad, cuya función tendrá que asumir en ausencia de ella. En esas circunstancias, $95,000 no es una suma exagerada y no debe intervenirse con la discreción ejercitada por el tribunal de instancia al concederla. El Juez Asociado Señor Rebollo López emitió opinión concurrente.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria General*

—O—

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Somos del criterio que una de las labores principales —sino la principal— de este honorable Tribunal es la de orientación y/o la de implantación de normas o guías que ayuden a la profesión legal en general y, en particular, respecto a aquellas áreas del derecho en donde, a pesar del esfuerzo realizado en el pasado, todavía existen lagunas que dificultan la labor que realizan día a día nuestros compañeros jueces de instancia y nuestros compañeros abogados. Entendemos que tenemos la obligación de así hacerlo, no obstante el hecho de estar conscientes de que dichas normas y guías, por ser precisamente la creación de seres humanos, nunca podrán ser perfectas y por ello, las mismas estarán siempre sujetas a modificación y corrección en el futuro.

La valorización de daños en general y, particularmente, la de sufrimientos y angustias mentales en el amplio campo

de los daños y perjuicios, es un vivo ejemplo de esas "lagunas" de las cuales hablamos. En cuántas ocasiones se habrán preguntado nuestros compañeros abogados: ¿cuánto vale este caso? Cuántas veces se habrán hecho los señores jueces de instancia la misma pregunta, con el agravante de que sobre sus hombros pesa la no envidiable responsabilidad de tener que resolverlo.

Este honorable Tribunal, a través de los años, ha bregado mayormente *caso a caso* con este aspecto problemático del derecho, utilizando a menudo el mecanismo procesal de la sentencia para así hacerlo. En el pasado hemos contestado la arriba mencionada pregunta expresando, en síntesis, que estamos conscientes del hecho de que la gestión judicial de estimación y valoración de daños es angustiosa y difícil; que la obligación de evaluar los mismos descansa, principalmente, en nuestros jueces de instancia; y que este Tribunal no intervendrá en la discreción de los referidos jueces, a menos que las sumas de dinero concedidas sean o exageradamente altas o ridículamente bajas.

Si algunos están conscientes y saben que dicha labor es angustiosa y difícil son los jueces de instancia, los cuales se ven en la obligación de realizarla día tras día. Nunca, sin embargo, se les ha provisto de unas normas o guías que sirvan de base para la evaluación de daños. La ausencia de dichas normas o guías posiblemente sea la razón principal para que haya tan distintas y variadas adjudicaciones a esos efectos por parte de nuestros tribunales de instancia e, inclusive, por este mismo Tribunal.

*Somos del criterio que este Tribunal no sólo tiene el deber y la obligación de establecer esas normas y guías, sino que tiene, con el fin de intentar orientar al máximo a la profesión, el deber y la obligación de explicarle a los litigantes, hasta donde ello sea humana y jurídicamente posible, el porqué en un caso en específico se han aumentado o se han reducido las sumas de dinero que le fueron concedidas por el tribunal de instancia.* Con ello en mente, examinemos el presente caso.

El día 19 de diciembre de 1979, en horas de la noche, la Farmacia Banuchi —localizada la misma en jurisdicción del pueblo de Río Grande, Puerto Rico— como tantos otros negocios en nuestro país, fue asaltada por tres individuos armados, encontrándose en la misma, al momento del asalto, varios clientes y empleados, los cuales fueron obligados a acostarse en el piso de dicha farmacia. Una vez los asaltantes habían desvalijado las cajas registradoras y al disponerse éstos a salir de la referida farmacia, uno de los empleados de la misma —de nombre Alfonso Crespo Romero— se armó de una escopeta calibre 12 propiedad del Sr. Juan Banuchi, dueño de la farmacia, escopeta que había sido dejada por éste en dicho negocio. El ruido que hizo Crespo Romero al cargar la escopeta fue escuchado por los asaltantes —ya en el proceso *de abandonar* la farmacia— quienes entonces abrieron fuego; dichos disparos fueron contestados por Crespo Romero al mismo tiempo que se lanzaba al suelo; los asaltantes abandonaron la farmacia; Crespo Romero de inmediato se incorporó, escopeta en mano, y al dar unos pasos hacia el frente vio un movimiento o "celaje" a su derecha, y disparó en dirección al mismo, pensando que se trataba de uno de los asaltantes. Desgraciadamente, el "celaje" que vio Crespo Romero resultó ser la Sra. María Esther Trinidad Aponte, cliente que había entrado a la farmacia minutos antes de que se perpetrara el asalto con la intención de hacer unas compras en unión a su esposo y sus tres hijos menores de edad, quienes habían permanecido en el carro de la familia, estacionado el mismo en un área cercana, desde donde no se podía ver la entrada de la farmacia. La infortunada dama —que se había incorporado del piso— fue alcanzada por el disparo de escopeta que hiciera Crespo Romero a nivel de la región pre-auricular derecha; fue llevada, originalmente, al Centro de Salud de Carolina, siendo referida al Centro Médico de Puerto Rico donde, a la llegada al mismo, fue pronunciada muerta.

El honorable Tribunal Superior de Puerto Rico, Sala de

Carolina, declaró con lugar la demanda de daños y perjuicios que radicara el esposo e hijos de la occisa contra la Farmacia Banuchi, su dueño Juan Banuchi, el empleado de éste Alfonso Crespo Romero, y la compañía aseguradora de la farmacia. Dicho tribunal condenó a la parte demandada a pagar, en forma solidaria a los demandantes, las siguientes sumas de dinero:

(a) A los menores David, Melvin y Sonia Magali Escobar Trinidad la suma de $16,000.00 a cada uno de ellos por la pérdida de su madre.

(b) A los menores David, Melvin y Sonia Magali Escobar Trinidad, herederos de María Esther Trinidad Aponte, la suma de $10,000.00 por concepto de los daños y perjuicios sufridos por ésta desde que fue objeto del disparo fatal y el instante de su muerte.

(c) A Marcial Escobar Galarza, la suma de $95,000.00 por la pérdida de su esposa y el consorcio de ésta.

(d) A Marcial Escobar Galarza, la suma de $81,954.11 por el lucro cesante producido por la muerte de María Esther Trinidad Aponte.

(e) A Marcial Escobar Galarza, la suma de $1,560.00 por los gastos del funeral de María Esther Trinidad Aponte.

La parte demandada, en el recurso de revisión que radicara ante este Tribunal, imputó al tribunal de instancia la supuesta comisión de nueve (9) errores, a saber:

### Primer Error

Cometió grave error de derecho el Tribunal de instancia al imponerle responsabilidad civil a los recurrentes en abierto desacuerdo con el valor y fuerza probatoria de la evidencia presentada.

### Segundo Error

Cometió grave error de derecho el Tribunal de instancia al imponerle responsabilidad civil a los demandados en ausencia de prueba para sostener la misma, descartando aquella prueba que exime de responsabilidad a los recurrentes.

### Tercer Error

Cometió grave error de derecho el Tribunal de instancia al interpretar la prueba desfilada formulando determinaciones de hechos que son físicamente imposibles contraviniendo [*sic*] el orden racional y que no hallan apoyo en la prueba e improvisando dichas determinaciones arbitrariamente.

### Cuarto Error

Las conclusiones de hecho del Tribunal de instancia no representan el balance más racional, justiciero y jurídico de la prueba practicada.

### Quinto Error

Erró el Tribunal de instancia al conceder a los menores David, Melvin y Sonia Magali Escobar Trinidad, herederos de María Esther Trinidad Aponte la suma de $10,000.00 por concepto de los daños y perjuicios sufridos por ésta desde que fue objeto del disparo fatal y el instante de su muerte.

### Sexto Error

Erró el Tribunal de instancia al eximir de negligencia concurrente a María Esther Trinidad Aponte y no reducir la indemnización concedida a los recurridos conforme a derecho.

### Séptimo Error

Erró el Tribunal de instancia al conceder a los recurridos la suma de $81,954.11 por concepto de lucro cesante producido por la muerte de María E. Trinidad Aponte habida cuenta que ésta era empleada ocasional y a tiempo parcial.

### Octavo Error

Erró el Tribunal de instancia al conceder partidas excesivas como indemnización a los demandantes.

### Noveno Error

Erró el Tribunal de instancia al conceder honorarios de abogado e intereses legales sobre la sentencia desde la radicación de la demanda sin haber mediado temeridad de parte de los recurrentes.

Este Tribunal, entendiendo correcta la determinación que sobre negligencia hiciera el tribunal de instancia, requirió de la parte demandante recurrida que mostrara causa por la cual no se debían modificar las sumas de dinero concedidas a los demandantes por el tribunal de instancia "por ser las mismas improcedentes y/o excesivas". La parte demandante recurrida compareció.

I

La parte recurrente, mediante *el quinto señalamiento de error*, impugna la suma de $10,000 que el tribunal de instancia concediera a los herederos de María Esther Trinidad Aponte "por concepto de los daños y perjuicios sufridos por ésta desde que fue objeto del disparo fatal y el instante de su muerte".

En relación con dicho señalamiento de error, argumenta la parte recurrente que: "Tomando en consideración la enorme magnitud de sus lesiones [las de María Esther Trinidad] resulta inconcebible que la occisa haya sufrido desde el momento en que recibió el disparo hasta el momento de su muerte, *por el contrario*, la única inferencia razonable a que se puede llegar en base a los más rudimentarios conocimientos de la medicina, *es que la occisa murió instantáneamente* al recibir las extensas lesiones." (Énfasis suplido.)

Argumenta, adicionalmente, la parte recurrente a los efectos de que: *"No hubo ninguna prueba de que María Esther Trinidad Aponte sufriera* desde el momento en que recibió el disparo hasta el momento de su muerte. *Nadie declaró sobre este extremo."* (Énfasis suplido.)

En *Vda. de Delgado* v. *Boston Ins. Co.*, 101 D.P.R. 598 (1973), resolvimos, en síntesis, que la causa de acción no ejercitada de una persona que muere como consecuencia del acto u omisión negligente de otra —causa de acción en relación con el sufrimiento físico y moral que precedió al deceso— no constituye un derecho personalísimo que se extingue con la muerte de la persona, sino que es un bien

patrimonial que es transmitido a sus herederos y que es reclamable por éstos como parte de su herencia legítima.

En *Publio Díaz* v. *E.L.A.*, 106 D.P.R. 854, 872 (1978), señalamos que en la *valoración* de los sufrimientos físicos y mentales de un causante en esta clase de situaciones son factores determinantes en la evaluación de la cuantía a concederse "la naturaleza y extensión de las lesiones; *lapso de tiempo transcurrido entre la ocurrencia del daño y la muerte; estado de lucidez o conciencia de la víctima*; disponibilidad o no de asistencia y medicamentos adecuados; tipo de tratamiento recibido; presencia o ausencia de familiares; y cualquier otra circunstancia pertinente". (Énfasis suplido.)

Examinemos los hechos específicos del presente caso. Una lectura del protocolo de autopsia es suficiente para concluir que la occisa sufrió *graves y serias lesiones* al ser alcanzada por el disparo de escopeta. Se expresa en dicho protocolo, en lo pertinente, que:

> Como hallazgo de mayor interés encontramos múltiples perdigonadas en la cara en un área que se extiende en un diámetro de 7 x 6", tres de las cuales fueron pequeñas, penetrantes localizadas a nivel del puente, otra a 2" por encima de la ceja derecha y la tercera a 1" por encima de la ceja izquierda. *Además produjeron dos grandes orificios localizados ambos en la región pre-auricular derecha, uno a 59 ½" del talón y otro a 61" del mismo talón.* La exploración en profundidad reveló que ambos tenían agujeros de salida el primero de los mencionados salió inmediatamente por detrás de la oreja derecha, mientras que el segundo produjo su agujero de salida a 1" por detrás y por encima del oído derecho, a ese nivel se recuperó parte del corcho. *Ambos impactos a su paso produjeron fractura de el hueso temporal y parietal derechos.* Fueron recuperados varios pequeños perdigones en piel, tejido subcutáneo y área frontal de las heridas penetrantes. El cadáver muestra un área de tatuaje formada por pequeñas partículas de pólvora que se extienden desde el lado derecho del cuello hasta el brazo en un área que mide 9 x 9" de diámetro. (Énfasis suplido.)

Debemos tener presente que, según la jurisprudencia antes citada, lo verdaderamente importante —para que exista la causa de acción de los herederos del causante en esta clase de situaciones— es que la muerte no haya sido instantánea. Somos del criterio que de la prueba desfilada en el presente caso se puede hacer *la inferencia razonable* de que la muerte de María Esther Trinidad Aponte, a pesar de las graves lesiones recibidas, *no* fue instantánea. Ello es así por cuanto la prueba demuestra que la occisa fue llevada primero al Centro de Salud de Carolina, a donde presumiblemente llegó con vida, por cuanto de ahí fue referida al Centro Médico de Puerto Rico. Nos parece razonable la contención de que el personal de dicho Centro de Salud no la hubiera referido al Centro Médico, de ser la situación distinta.

Hecha la anterior determinación, procede que nos preguntemos: *¿qué lapso transcurrió entre la ocurrencia del daño y la muerte de María Esther Trinidad Aponte? Durante ese lapso de tiempo, ¿cuál fue el estado de lucidez o conciencia de la víctima?* La sentencia cuya revisión se solicita, en sus determinaciones de hecho, nada expresa al respecto. La parte demandante recurrida, en su comparecencia para mostrar causa —advertida de los argumentos de la parte recurrente— tampoco se expresa sobre el particular.

Ahora bien, estamos convencidos de que: la muerte de María Esther Trinidad Aponte *no* fue instantánea, por lo que sus herederos tienen una causa de acción por los sufrimientos físicos y angustias mentales de ella; y de que, *aun cuando no lo sabemos en específico*, hubo un lapso que podemos catalogar de considerable entre el momento de recibir el disparo y el momento de sobrevenirle la muerte —lapso por lo menos mayor que en el caso de *Publio Díaz* v. *E.L.A.*, supra— por cuanto la occisa fue trasladada de la farmacia localizada en Río Grande al Centro de Salud de Carolina, allí fue examinada y entonces referida al Centro Médico de Puerto Rico, donde arribó muerta.

Sobre lo que realmente no hay *prueba específica* es sobre el estado de lucidez y conciencia de María Esther durante ese lapso; en otras palabras, ¿tenemos los elementos de juicio necesarios para poder valorar dichos sufrimientos físicos y mentales? Sabido es que la obligación de ponernos en condiciones de así hacerlo correspondía a la parte demandante; [1] la oportunidad de hacerlo la tuvo y, por razones que desconocemos, no la aprovechó al máximo. [2] *Es por ello que la concesión de la suma de $10,000 por el tribunal de instancia no se puede sostener.*

## II

El tribunal de instancia le concedió a cada uno de los tres hijos menores de edad de María Esther Trinidad Aponte la suma de $16,000 "por la pérdida de su madre", y la suma de $95,000 a Marcial Escobar Galarza "por la pérdida de su esposa y el consorcio de ésta". La parte recurrente impugna las referidas sumas de dinero, mediante el octavo señalamiento de error, *"por excesivas"*.

A. *La Norma Propuesta*

Estamos conscientes de que la vida de un ser querido, desde el punto de vista del afecto y del cariño, tiene un valor inconmensurable que no se presta a valoración objetiva, *Travieso* v. *Del Toro y Travieso, Int.*, 74 D.P.R. 1009 (1953); y de que cada caso depende de sus propias circunstancias, *Meléndez* v. *Metro Taxicabs*, 68 D.P.R. 766 (1948). No empece ello ser así, los tribunales de instancia se ven en la obligación, como parte de sus funciones judiciales diarias,

---

[1] "Corresponde al demandante poner al juzgador en condiciones de determinar, sin recurrir a especulaciones, los daños y perjuicios realmente sufridos." *Rodríguez* v. *Serra*, 90 D.P.R. 776, 779 (1964).

[2] "Pocas veces podrá presentarse al juzgador un caso más claro que éste en cuanto a la procedencia de la indemnización, en que, eso no obstante, no pueda concederla por haber dejado de proporcionarle la parte que la reclamó[,] y que por tanto tenía el deber de hacerlo, los datos necesarios para fijarla." *Boria* v. *The Maryland Casualty Co.*, 60 D.P.R. 830, 837 (1942).

de tener que valorar en dólares y centavos esos sufrimientos y angustias mentales.

Somos del criterio que en el desempeño de dicha difícil labor resultaría de incuestionable ayuda la adopción de una norma mediante la cual se utilizara, como punto de partida, *la valorización que en casos "similares" este Tribunal ha considerado como adecuada en el pasado*; la razón principal de ello, siendo como es claro que los sufrimientos y angustias que experimenta una persona en determinado momento, digamos, por la muerte de un ser querido y/o la fractura de una pierna *no* varían con el transcurso de los años.

Estamos conscientes, sin embargo, del hecho de que si bien es cierto lo anteriormente expresado, *dichas pasadas valorizaciones, en justicia, tendrían que ser "actualizadas"*; ello debido a que el "valor" del dinero hoy día no es el mismo que hace, digamos, cinco o diez años atrás por razón del alza en el costo de la vida que nuestra sociedad ha venido sufriendo durante los últimos años. Véase: *Rojas* v. *Maldonado,* 68 D.P.R. 818 (1948).

Una vez así "ajustadas" las valorizaciones que hemos hecho en el pasado en casos "similares", *entrarían en juego la forma y manera como ocurrieron los hechos y las circunstancias especiales presentes en el caso específico que esté considerando el tribunal;* (³) circunstancias especiales que, como sabemos, corresponde probar mediante evidencia competente a la parte que las alegue y reclame y sobre las cuales los tribunales de instancia tendrán que hacer las correspondientes determinaciones de hecho. Entendemos que ello le permitiría a dichos tribunales, con cierto grado de uniformidad, fijar aquellas sumas de dinero que consideren razonables y adecuadas y pondría a este Tribunal en condi-

---

(³) En relación con ello es imposible, naturalmente, el poderlas enumerar todas. Así, por ejemplo, en un caso de una fractura de una pierna pueden ser tomadas en consideración por el tribunal de instancia circunstancias tales como si la persona tuvo que ser intervenida quirúrgicamente; si tuvo que permanecer en cama, ya fuera en el hospital o en su casa; el término del período de recuperación; si tuvo que ser sometida a terapia; si resultó con alguna incapacidad, etc.

ciones, si es que se solicita revisión al respecto, de resolver si dichas sumas de dinero son "ridículamente bajas o exageradamente altas". *Urrutia* v. *A.A.A.*, 103 D.P.R. 643 (1975).

### B. *Aplicación de la Norma Propuesta*

Un examen sereno y desapasionado de las sumas de dinero concedidas en el pasado por este Tribunal en casos similares,[4] habiendo tomado en consideración los años en que fueron resueltos los mismos; de las determinaciones de hecho que hiciera el tribunal de instancia sobre cómo ocurrieron los hechos en el presente caso y sobre las circunstancias especiales presentes en el mismo;[5] y de la argumentación de la parte recurrida contenida en el escrito que radicara para mostrar causa, nos convence de que la suma de dinero concedida por el tribunal de instancia al esposo de la occisa —$95,000— en efecto es excesiva. Consideramos, por el contrario, razonable y adecuada la suma de $50,000.

En relación con la suma de $16,000 concedida *a cada uno* de los tres hijos menores de edad[6] de la dama falle-

---

[4] En *Vda. de Delgado* v. *Boston Ins. Co.*, 99 D.P.R. 714 —*resuelto en 1971*— valoramos en *$20,000*, los sufrimientos y angustias mentales de una dama que, además de perder a su esposo, estuvo constantemente al lado de éste durante los tres días que el occiso viviera después de ser víctima de una explosión que le causó graves quemaduras y, por último, la muerte. En *Colón* v. *Municipio de Orocovis*, 100 D.P.R. 1009 (*1972*), se le concedió al esposo de una dama —madre de cuatro hijos, que murió al intentar cruzar un río crecido— la suma de *$25,000*, la cual fue reducida en un 50% por razón de la negligencia en que incurrió la occisa. En *Vda. de Morales* v. *De Jesús Toro*, 107 D.P.R. 826 (*1978*) —caso en que la viuda demandante *presenció* la agresión que culminó en la muerte de su esposo, muerte que puso fin a un matrimonio de diez y seis (16) años—, valoramos los sufrimientos y angustias mentales de la referida viuda en la suma de *$25,000*.

[5] En la Determinación de Hecho Núm. 31 expresa el tribunal de instancia, en lo pertinente, que: "Es indescriptible el dolor, el sufrimiento y la angustia que aún a la fecha de la vista del caso experimenta el demandante Marcial Escobar Galarza no solamente por la pérdida de su esposa y madre de sus hijos, sino por la abrupta ruptura de su joven familia. El desbalance emocional y los sufrimientos que experimenta dicho demandante quedaron de manifiesto al ocupar la silla testifical. El Tribunal pudo apreciar cómo Escobar Galarza pudo hacer un recuento de los hechos que presenció durante la noche de autos hasta que llegó el momento en que encontró a su esposa tirada en el piso sobre un charco de sangre."

[6] De siete, cinco y dos años y medio de edad.

cida, la misma no es "exageradamente alta", *Urrutia* v. *A.A.A.*, supra, por lo que sostenemos el dictamen a este respecto del tribunal de instancia. [7]

### III

Como hemos visto, mediante el séptimo señalamiento de error, la parte recurrente impugna la suma de $81,954.11 que por concepto de *lucro cesante* concediera el tribunal de instancia, principalmente, por el fundamento de que María Esther Trinidad Aponte "era empleada ocasional y a tiempo parcial". [8]

Dicho concepto ha sido objeto de interpretación y consideración en innumerables ocasiones por este Tribunal: *Vda. de Seraballs* v. *Abella Hernández*, 90 D.P.R. 368 (1964); *Rodríguez* v. *Ponce Cement Corp.*, 98 D.P.R. 201 (1969); *Vda. de Delgado* v. *Boston Ins. Co.*, 99 D.P.R. 714 (1971); *Sánchez* v. *Liberty Mutual Ins. Co.*, 100 D.P.R. 1 (1971); *Colón* v. *Municipio de Orocovis*, 100 D.P.R. 1009 (1972); *Publio Díaz* v. *E.L.A.*, supra; *Suro* v. *E.L.A.*, 111 D.P.R. 456 (1981); y *Velázquez* v. *Ponce Asphalt*, 113 D.P.R. 39 (1982).

Hemos resuelto, *en términos generales*, que el lucro cesante se trata de un *perjuicio* sufrido que consiste en una *ganancia futura frustrada* que con *cierta probabilidad era de esperarse*, según el curso normal ulterior de las cosas, *la realización de cuya ganancia no tiene que ser demostrada*

---

[7] En *Vda. de Delgado* v. *Boston Ins. Co.*, supra, pág. 729, *resuelto en 1971*, concedimos la suma de $10,000 a cada uno de los tres hijos menores codemandantes por los daños sufridos "al ser privados de la compañía, cariño y de la dirección de su padre, en la formación emocional y espiritual de ellos, en la temprana edad que es cuando más lo necesitaban"; y en *Publio Díaz* v. *E.L.A.*, 106 D.P.R. 854, *resuelto en 1978*, concedimos $15,000 a cada menor codemandante, siendo reducida dicha suma de dinero en un 50% por razón de la negligencia en que incurrieron sus padres.

[8] La parte recurrente entiende que, suponiendo que procediera compensación por concepto de lucro cesante en el presente caso, la misma asciende a la suma de *$25,558.22*.

*con certeza absoluta* por la parte perjudicada, *Velázquez* v. *Ponce Asphalt*, supra; que los daños a concederse por lucro cesante *no* pueden ser determinados *exclusivamente* a base de la "ecuación matemática" o "fórmula" expuesta en los casos normativos de *Vda. de Seraballs* v. *Abella Hernández*, y *Rodríguez* v. *Ponce Cement Corp.*, supra, por cuanto la razonabilidad de la cuantía total a concederse por lucro cesante *no* puede depender únicamente de unos cómputos aritméticos que en fin de cuentas descansan sobre unas bases y expectativas que, aunque precisables, están permeados de cierto grado de especulación; que en su consecuencia, dicha ecuación o fórmula es sólo *uno* de los factores a tomarse en consideración, junto a las demás circunstancias del caso, a los fines de determinar *la razonabilidad* de la cuantía a concederse, *Vda. de Delgado* (1971), pág. 729, y *Publio Díaz* v. *E.L.A.*, supra; que la parte que reclama compensación por lucro cesante debe aducir prueba sobre el estado de salud y el promedio del ingreso del causante [9] durante algunos años antes del suceso que causó la muerte, *Colón* v. *Municipio de Orocovis*, y *Vda. de Delgado* (1971), supra; y que al calcularse el lucro cesante hay que tener presente que existe una diferencia entre la "expectativa de vida" de una persona y la *"expectativa de vida útil"* de la misma, o sea, el número de años en que *una persona en particular* va a estar *efectivamente generando ingresos*, concepto que es *flexible* y que depende de la edad, sexo, ocupación, estado de salud, hábitos, etc., de la persona fallecida, *Suro* v. *E.L.A.*, supra.

La "fórmula" o "ecuación matemática" a utilizarse en el cómputo del lucro cesante, *según el estado actual de nuestra jurisprudencia*, [10] es la siguiente:

---

[9] O de la persona accidentada y/o incapacitada.

[10] La misma fue originalmente expuesta en *Vda. de Seraballs* v. *Abella Hernández*, 90 D.P.R. 368 (1964). Unos años más tarde fue modificada en el caso de *Rodríguez* v. *Ponce Cement Corp.*, 98 D.P.R. 201 (1969), al resolverse que no era

*A.* Debe determinarse, en primer lugar, el *ingreso promedio anual* del causante o persona accidentada.

El mismo se determina dividiendo la suma total de los *ingresos*([11]) que hubiera percibido el causante durante su "vida útil" —debiéndose haber tomado en consideración, como expresáramos en el escolio 10, los aumentos anuales que hubiera tenido *el salario* del causante por concepto de "pasos autorizados por ley" y/o el "incremento anual promedio"—([12]) por el número de años restantes de vida útil del causante.

*B.* Al ingreso promedio anual se le resta una tercera parte del mismo por concepto de los "gastos propios" del causante; y

*C.* Las restantes dos terceras partes se multiplican, entonces, por el valor de un dólar por año, pagadero al final de cada año, durante el número de años correspondiente a la expectativa de vida útil tomando, a esos efectos, el valor menor de la tabla actuarial que es a base del seis (6) por ciento.

Teniendo presente que dicha "fórmula" es sólo uno de los factores a tomarse en consideración, *junto a las demás circunstancias del caso,* a los fines de determinar *la razonabi-*

---

procedente el que se deduzca del ingreso anual del causante las sumas de dinero a "pagarse por éste" por concepto de contribución sobre ingresos.

Posteriormente, se modificó dicha "fórmula" en los casos de *Sánchez* v. *Liberty Mutual Ins. Co.*, 100 D.P.R. 1 (1971), y *Suro* v. *E.L.A.*, 111 D.P.R. 456 (1981), en tanto en cuanto se permite que en la estimación del ingreso anual del causante pueden tomarse en consideración los aumentos anuales progresivos que tendría *el salario* del causante por concepto de "pasos autorizados por ley" y/o el "incremento anual promedio", respectivamente.

([11]) Dichos "ingresos" incluyen, naturalmente, no sólo el salario propiamente, sino cualquier otra entrada o ingreso del causante. Así, por ejemplo, tenemos que en el caso de *Suro* v. *E.L.A.*, supra, se tomó en consideración ingresos que percibía el causante por razón de pertenecer a la Guardia Nacional de Puerto Rico.

([12]) Dicho "incremento anual promedio" se computa *multiplicando* la "mediana" del ingreso semanal de las industrias en Puerto Rico —la cual se puede obtener en publicaciones oficiales a esos efectos del Departamento del Trabajo de Puerto Rico— *por* las cincuenta y dos (52) semanas que tiene el año. *Suro* v. *E.L.A.*, supra.

*lidad* de la cuantía a concederse por concepto de lucro cesante, *Vda. de Delgado* (1971) y *Publio Díaz* v. *E.L.A.*, supra, examinemos los hechos específicos del caso que nos ocupa.

La alegación principal de la parte recurrente respecto a la concesión por el tribunal de instancia de la partida por lucro cesante es a los efectos de que la misma es totalmente improcedente por razón de que, habiendo sido la occisa meramente una *empleada ocasional* y a *tiempo parcial*, cualquier cómputo que se realice a esos efectos es totalmente especulativo.

No tiene razón; su contención a esos efectos es totalmente inmeritoria. *Aparte del hecho de que un empleo a tiempo parcial puede servir de base, presentes las demás circunstancias requeridas, para la concesión de daños por concepto de lucro cesante*, tenemos que en el presente caso el tribunal de instancia, conforme a la prueba desfilada, determinó que María Esther Trinidad Aponte, dama que a la fecha de su muerte contaba con la edad de 29 años, se desempeñó como operaria de máquinas en una fábrica desde el 1974; que la empresa para la cual ella trabajaba solamente operaba durante ciertos y determinados meses al año por razón de dedicarse a la manufactura de artículos de Navidad; y que por las razones antes expresadas, la occisa trabajaba sólo durante cinco (5) meses —aproximadamente ochocientas y pico de horas— al año.

Como vemos, la occisa era una *empleada regular* que trabajó *a tiempo completo* durante un sinnúmero de años y que no trabajaba el año completo, no porque ella no quisiera, sino porque la empresa para la cual ella trabajaba no lo hacía así. Dichas circunstancias adecuadamente permiten que se pueda calcular, con un grado satisfactorio de probabilidad, la futura ganancia frustrada de la occisa. *Velázquez* v. *Ponce Asphalt*, supra.

Ahora bien, un examen del procedimiento seguido por el tribunal de instancia en el cómputo del lucro cesante revela

que, no obstante dicho tribunal haber realizado un esfuerzo notable por cumplir con la jurisprudencia nuestra a esos efectos, el resultado final al cual éste llegó debe ser modificado respecto a la suma de dinero —$81,954.11— que concedió a los herederos de la occisa por este concepto. ([13])

*Ello es así por cuanto el tribunal de instancia, al realizar el cómputo, incidió en dos aspectos:* aplicó erróneamente a los hechos del presente caso la fórmula sobre expectativa de vida útil —"hasta la edad de 70 años"— que utilizáramos en el caso de *Suro* v. *E.L.A.*, supra. Examinados los hechos del presente caso —tomando en consideración la ocupación, edad, sexo, hábitos, idiosincrasia, etc., de la aquí causante— concurrimos con el criterio de que se ajusta más a la realidad la "fórmula" que hemos aplicado en otros casos, a los efectos de una expectativa de vida útil hasta los 65 años. *Vda. de Delgado* (1971), supra.

Incidió, igualmente, el tribunal de instancia al computar el "incremento anual promedio": dicho tribunal multiplicó la "mediana" del ingreso semanal de la industria dentro de

---

([13]) Ante el tribunal de instancia se presentó prueba de que durante el año de 1978 la occisa devengó salarios ascendentes a $1,549.18, y la suma de $2,203.01 durante el año de 1979, último año en que ella trabajó. Dicho tribunal tomó conocimiento judicial del salario mínimo federal que cubría la industria en la que la occisa trabajaba para el año 1980 —$3.10 la hora— y para el año de 1981 —$3.35 la hora— con el propósito de computar lo que la occisa "hubiera devengado" durante los citados años, llegando a la conclusión —multiplicando las ochocientas y pico de horas que la occisa trabajaba durante un año por el salario mínimo de $3.35 la hora— que en el 1981 ella hubiera percibido salarios ascendentes a la suma de $2,773.80. A base de esta cifra hizo una proyección de lo que habría ganado la occisa durante los restantes años de vida útil —que estimó hasta los 70 años— de la causante, tomando en consideración un "incremento anual promedio" de $281.32, a la cual cifra arribó multiplicando la "mediana" del ingreso semanal de la *industria de la manufactura* en Puerto Rico durante los años de 1966 a 1981 —$5.41— por las 52 semanas del año.

El *tribunal de instancia entonces dividió el total de los ingresos proyectados* —$332,948.40— por el número de años de vida útil restantes, obteniendo así un *ingreso promedio anual* de $8,120.70, al cual le restó una tercera parte por concepto de "gastos propios" de la occisa. Procedió a "actualizar" las dos terceras partes restantes, arrojando ello la suma final que concedió, $81,954.11, por concepto de lucro cesante.

la cual se desempeñaba la occisa en Puerto Rico —la industria de la manufactura— por las 52 semanas que tiene un año, operación matemática que es la que usual y normalmente se realiza en esta clase de casos. El problema en el presente caso estriba en que la empresa para la cual trabajaba la occisa, según la prueba aportada, no opera durante ese período y sí durante 20 semanas al año; ese es el término por el cual entendemos se debe multiplicar la "mediana" aquí. De otra forma, la causante "recibiría el beneficio" de un aumento salarial computado a base de un año completo de trabajo, hecho que alejaría de la realidad el aumento de salario —por razón del incremento anual promedio— proyectado a través de los restantes años de vida útil de la causante.

Una vez realizados los dos ajustes o las dos modificaciones antes señaladas, la suma de dinero por concepto de lucro cesante, a la que razonablemente entendemos que tienen derecho los herederos de la causante, es la de $45,500 aproximadamente.

Por las razones antes expresadas es que concurrimos con la Sentencia emitida por este honorable Tribunal.