*In re* WILLIAM FELICIANO RUIZ.

*Número:* MC-85-61 *Resuelto:* 29 de abril de 1986

*Héctor Rivera Cruz, Secretario de Justicia, Rafael Ortiz Ca-*
*rrión, Procurador General* y *Ricardo E. Alegría Pons, Pro-*
*curador General Auxiliar,* abogados de El Pueblo; *Waldemar*
*Del Valle López* y *Pedro Malavet Vega,* abogados del que-
rellado.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

I

Las señoras Olga J. Negrón Gaztambide y Olga L. Gaztambide Vda. de Negrón presentaron una queja ante el Procurador General contra el notario William Feliciano Ruiz. Previa investigación al efecto, el Procurador nos rindió su informe, que en síntesis, refleja que dicho notario otorgó en Ponce la escritura Núm. 76 el 17 de septiembre de 1975, denominada *Compraventa,* y el 6 de junio de 1977 la Núm. 38, sobre *Segregación, Compraventa con Precio Aplazado, Agrupación y Constitución de Hipoteca,* y en las mismas figuraban indebidamente las quejosas como mandantes sin haber conferido poder o mandamiento alguno. [1] Concluye el Procurador General que tal proceder violó el requerimiento de fe pública notarial.

Requerimos al notario Feliciano Ruiz que compareciera a mostrar causa por la cual no debería ser disciplinado. En su escrito acepta que no pidió prueba del mandato antes de otorgar las escrituras. Expone una serie de trámites que precedieron a las escrituras, tales como consultas ante la Administración de Reglamentos y Permisos (ARPE), reuniones de los integrantes de la sucesión, incluso con las señoras Negrón Gaztambide y Gaztambide Vda. de Negrón, indicativas y configurativas de un mandato verbal y acreditativas de un conocimiento previo y posterior, susceptible de estimarse como una ratificación. Aduce que su actuación al autorizar las escrituras antes mencionadas fue de índole incidental, gratuita y de la mejor buena fe. Nos señala que no las redactó y confió plenamente en lo que le manifestaron el mandatario Sr. Luis A. Nazario Negrón y otro de los comparecientes, el Lic. Negrón López, en cuanto a la existencia del mandato. Final-

---

[1] Las quejosas presentaron certificaciones negativas del Registro de Poderes en respaldo de dicha aseveración.

mente argumenta que no hubo incumplimiento notarial alguno de su parte y que "sus afirmaciones [en las escrituras] se basa[ron] en las manifestaciones de los comparecientes, avaladas por su conducta anterior y el prestigio de todas las partes envueltas".

En su réplica el Procurador General recalca la doctrina referente a la figura del mandato, la importancia de la dación de fe, y reitera su posición.

## II

En lo pertinente, ambas escrituras, respectivamente, rezan:

‒ ‒ ‒ Y de la otra parte: DON LUIS ANGEL NAZARIO NEGRON, casado con doña Gelly María Ortiz Candelario, propietario y vecino de Ponce, Puerto Rico, por sí, *y en su carácter de mandatario con facultad bastante para el presente otorgamiento,* de los siguientes mandantes . . . . (Énfasis suplido.) *Exhibit* I.

‒ ‒ ‒ De una parte: DON LUIS ANGEL NAZARIO NEGRON y su esposa DOÑA GELLY MARIA ORTIZ CANDELARIO, propietarios y vecinos de Ponce, Puerto Rico, *concurriendo ambos por sí, y el primero además en su carácter de mandatario con facultad bastante para el presente otorgamiento de los siguientes mandantes* . . . . (Énfasis suplido.) *Exhibit* II.

A su vez, los dos instrumentos tenían este mismo lenguaje:

‒ ‒ ‒ CONOZCO a los comparecientes y por sus dichos me constan sus circunstancias personales. Me aseguran tener, *y a mi juicio tienen la capacidad legal necesaria para este otorgamiento* y en su virtud, libre y voluntariamente EXPONEN . . . . (Énfasis suplido.) *Exhibit* I y II.

Lo fluido de este lenguaje, esencial para la disposición del asunto, nos permite formular la verdadera interrogante planteada: ¿Cuál es la mejor práctica notarial al autorizarse una escritura cuando comparece ante el notario un mandatario

sin acreditar documentalmente su capacidad como tal? [2] Para contestarla, es menester reseñar varios de los principios elementales en que se apuntala el notariado. "El notario es un profesional del Derecho que ejerce una función pública para robustecer, con una presunción de verdad, los actos en que interviene, para colaborar en la formación correcta del negocio jurídico y para solemnizar y dar forma legal a los negocios jurídicos privados, y de cuya competencia sólo por razones históricas están sustraídos los actos de la llamada jurisdicción voluntaria." (Énfasis suprimido.) E. Giménez-Arnau, *Derecho Notarial*, Pamplona, Eds. Univ. Navarra, 1976, pág. 52.

Nuestra Ley Notarial sigue esta concepción al preceptuar que el "notario es el único funcionario autorizado para dar fe y autenticidad, conforme a las leyes, a los contratos y demás actos extrajudiciales que ante su presencia se realicen". 4 L.P.R.A. sec. 1001.

---

[2] Según el Art. 1600 del Código Civil, el contrato de mandato es aquel contrato mediante el cual "se obliga una persona a prestar algún servicio o hacer alguna cosa, por cuenta o encargo de otra". 31 L.P.R.A. sec. 4421. Puede ser expreso o tácito. "El expreso puede darse por instrumento público o privado *y aun de palabra*. La aceptación puede ser también expresa o tácita, deducida esta última de los actos del mandatario." (Énfasis suplido.) Art. 1601, Código Civil, 31 L.P.R.A. sec. 4422.

A su amparo y en armonía con el Art. 1232 del Código Civil, 31 L.P.R.A. sec. 3453 —preceptivo de cuáles actos y contratos deberán constar en documento público— hemos resuelto que no son nulos los contratos celebrados por mandatarios con poder o autorización verbal. *Colón* v. *El Registrador*, 18 D.P.R. 125 (1912); *Purcell* v. *El Registrador de la Propiedad*, 14 D.P.R. 752 (1908); *Maestre* v. *El Registrador de la Propiedad*, 14 D.P.R. 682 (1908).

En *Dávila Vega* v. *Agrait Vda. de Dávila*, resolución de 1 de octubre de 1985, dijimos: "Se ha sostenido que 'expreso' no se opone a 'tácito'. En latín *expressus* significaba una declaración clara, pero no una declaración formal. En castellano, 'expreso' significa claro y patente, pero no exige el uso de ninguna palabra sacramental. Juan Vallet de Goytisolo, *Comentarios al Código Civil y Compilaciones Forales*, Madrid, Ed. Revista de Derecho Privado, 1982, T. XI, pág. 348." R-84-24, págs. 25-26.

 El notario ejerce una función clave de inestimable importancia en los negocios jurídicos. Es custodio de la fe pública. Al autorizar un documento presuntivamente da fe pública y asegura que ese documento cumple con todas las formalidades de ley, formal y sustantivamente, que el documento es legal y verdadero, y que se trata de una transacción válida y legítima. La investidura que conlleva la fe pública notarial va acompañada de una presunción controvertible a los actos que ve y oye —*vidit et audit*— de que lo allí consignado es legal y verdadero. En resumen, la dación de fe está avalada por la confianza de que los hechos jurídicos y circunstancias que acredite fueron percibidos con sus sentidos. A. Neri, *Tratado teórico y práctico de derecho notarial*, Buenos Aires, Ed. Depalma, 1969, Vol. I, pág. 445 *et seq.*; J. M. Sanahuja y Soler, *Tratado de Derecho Notarial*, Barcelona, Ed. Bosch, 1945, T. 1, pág. 15 *et seq.* Es evidente pues, que la fe pública constituye la espina dorsal del cuerpo notarial.

> *Fe pública notarial* equivale a la necesidad de aceptar por todos los ciudadanos cuanto el Notario autorice y afirme por su propia autoridad, a la cual va unido el conocimiento científico, y, por lo mismo, verdadero y cierto de lo autenticado y dado por válido y existente. (Énfasis en el original.) J. M. Mengual y Mengual, *Elementos de Derecho Notarial*, Barcelona, Ed. Bosch, 1933, T. 2, Vol. 2, pág. 117.

 Como profesional del Derecho, es deber del notario conocer las leyes, la doctrina, las costumbres y jurisprudencia. *Goenaga* v. *O'Neill de Milán*, 85 D.P.R. 170 (1962); P. Malavet Vega, *Notas sobre el derecho notarial puertorriqueño*, Ponce, Esc. Der. Univ. Católica, 1968, pág. 53. En el descargo de su encomienda tiene el deber de calificar la capacidad de las partes. Nuevamente Giménez-Arnau nos orienta: "La calificación de la capacidad viene impuesta por la naturaleza y la finalidad del instrumento público: se trata de un requisito que conceptual y lógicamente viene impuesto *ab initio* para

conseguir la eficacia del documento y del acto documentado." (³) Giménez-Arnau, *op. cit.*, pág. 527.

■ El ámbito de la capacidad inextricablemente guarda correspondencia lógica con el consentimiento de los contratantes, sin el cual no hay contrato. La regla general es que su existencia surja con la comparecencia y presencia de la persona ante el notario. La excepción es el mandato o poder. "El contrato celebrado a nombre de otro por quien no tenga su autorización o representación legal será nulo, a no ser que lo ratifique la persona a cuyo nombre se otorgue antes de ser revocado por la otra parte contratante." Art. 1211, Código Civil, 31 L.P.R.A. sec. 3376.

■ Notamos pues, que en situaciones como la que nos ocupa, es necesario la existencia del mandato como medio para permitir contratar a nombre de otro, a menos que después sus actuaciones sean ratificadas. El análisis que precede apunta hacia una sola conclusión: el deber de todo notario de cerciorarse de la capacidad de las partes, para que de esta manera se cumplan todos los requisitos de los contratos, en particular el consentimiento. De existir un mandato escrito, la mejor práctica es que el notario exija el documento que así lo acredita.

---

(³) Se han sugerido varios elementos de importancia para una prudente decisión sobre la capacidad de los otorgantes:

"(1) La capacidad de goce del representado.

"(2) La capacidad de ejercicio del representante. La capacidad de obrar del representado en la representación voluntaria habrá sido previamente calificada por aquel que autoriza el poder; pero no está obligado el Notario ante el que comparece el representante a aceptar la calificación previa del compañero, si tiene otros elementos de juicio que pueden hacer dudar de la exactitud de la anterior calificación.

"(3) La forma o validez documental del apoderamiento.

"(4) El buen uso del poder, en el sentido no moral, sino estrictamente jurídico, es decir, que el representante obre dentro de los límites y facultades que en él se hayan señalado." E. Giménez-Arnau, *Derecho Notarial*, Pamplona, Eds. Univ. Navarra, 1976, pág. 551.

## III

█ Al confrontar las normas expuestas, coincidimos con el notario Feliciano Ruiz en que la dación de fe sobre la capacidad del mandatario Nazario Negrón vertida en los instrumentos no dependía de la existencia escrita del supuesto mandato. Nuestro Código Civil reconoce la validez del mandato verbal.

█ Sin embargo, no podemos aceptar su tesis totalmente. Son los hechos y circunstancias que percibe el notario con los sentidos lo que sirve de sostén para la dación de fe. En este asunto el lenguaje por él utilizado, al dar fe de la capacidad del señor Nazario Negrón, como mandatario, no fue lo suficientemente claro. Crea dudas. Tiende a sugerir que el notario tuvo ante sí, o que previa y personalmente conocía, la existencia del mandato. No hizo reservas al respecto ni aclaró prudencialmente la situación. A modo de ejemplo, pudo muy bien haber utilizado el siguiente lenguaje, o uno análogo, descriptivo de su apreciación notarial:

y D . . . , comprador, en nombre como apoderado de D . . . . (circunstancias personales). *Esta representación no la justifica de momento dicho señor, aunque afirma tenerla y asegura acreditarla donde y cuando fuere menester, sin perjuicio de que, caso contrario, sea ratificada su actuación y confirmado este contrato ante y por quien corresponde legalmente.* Yo, el Notario, hago la pertinente advertencia y por conformidad de todos los comparecientes, autorizo el presente instrumento público.

Conozco a los comparecientes y les considero jurídicamente capacitados —*con la salvedad anterior*—, según concurren, para otorgar esta escritura, etc. M. González López, *Manual de Práctica Notarial,* 3ra ed., Ed. Artes Gráficas Galicia, 1978, pág. 116.

Esta aclaración —que constituye la mejor práctica— hubiese de su faz acreditado los límites de su intervención respecto a la capacidad del señor Nazario Negrón, viabilizando

así la eficacia de las escrituras. De esa manera los terceros estaban debidamente advertidos sobre este extremo, a la par que el notario descargaba eficaz y plenamente su gestión. Un ilustre comentarista compendia de este modo esa función:

La *función del notario* se inserta en el mismo tráfico negocial, con su labor asesora; se sitúa entre las partes, como tercero imparcial, que recoge su voluntad negocial, la traduce jurídicamente, configura, redacta y dota de una presunción de legalidad y de su fe pública al texto por él autorizado, y abarca como objetivos, en orden a la seguridad de los otorgantes, desde el control de su ajustamiento a derecho hasta su correcta redacción jurídica y su autorización que la dota de autenticidad. Es decir, que la actividad del notario no se refiere "sólo a un negocio presente, sino que empieza cuando todavía es futuro, y dependiendo de la voluntad de ellas (de las partes), puede aún moldearse, sustituirse o deshacerse" —como dice Rodríguez Adrados—, en virtud de una actividad que no es autorizante, pero que sí es específicamente notarial, en cuanto ligada en los países de derecho latino, indisolublemente a la actividad documental. J. Vallet De Goytisolo, *La seguridad jurídica en los negocios dispositivos*, 13 Rev. Jur. U. I. 37, 47 (1978).

Hemos de aclarar, que en este asunto, no queda excluida la posibilidad de ratificación, pues un acto concluido sin poder es anulable. De ratificarse, se superaría el problema documental aludido, incluso su suficiencia para la eventual entrada de las escrituras al Registro de la Propiedad. *Quiñones Quiñones* v. *Quiñones Irizarry*, 91 D.P.R. 225, 279 (1964). Otra vez Giménez-Arnau nos ilustra:

En cierto modo está pendiente de que se acredite la suficiencia y existencia del poder; viene a ser como un *negocio jurídico incompleto*, por lo menos en cuanto a la forma, ya que la plenitud de efectos sólo se produce con la superposición al documento concluido u otorgado por representación de aquel otro que justifique la capacidad del otorgante para actuar en nombre ajeno. Giménez-Arnau, *op. cit.*, pág. 549.

No obstante, la incógnita de si el mandato existió o fue ratificado por las quejosas en virtud de los hechos consignados en las declaraciones juradas de varias personas prestadas con posterioridad, al igual que las demás circunstancias aludidas por el notario Feliciano Ruiz, incluso no haberse impugnado judicialmente, es materia que no nos corresponde en esta instancia dilucidar. Esos hechos, de ser menester, deben adjudicarse ante los tribunales en un proceso distinto. Después de todo, este asunto se origina en la órbita de nuestra jurisdicción disciplinaria, no en la judicial. No tenemos que prejuzgarlo.

## IV

Finalmente, el notario Feliciano Ruiz nos indica que no redactó los documentos como tampoco devengó honorarios. También aduce que actuó movido por la amistad que le une a algunas de las partes. Su intervención fue casual. Ambas circunstancias, si bien atemperan, no lo eximen totalmente. Aunque haya autorizado las escrituras a ruegos de sus amigos y sin cobrar honorarios, su responsabilidad, en la dimensión profesional es personal, indivisible e indelegable. *In re Laboy*, 113 D.P.R. 476, 481 (1982); *In re Meléndez Pérez*, 104 D.P.R. 770 (1976). Reiteramos que la "notaría es faena de tiempo y paciente integración de todos los elementos documentales, que sufren en su calidad con la festinación y la atracción de los atrechos fáciles". *Empire Life Ins. Co.* v. *Registrador*, 105 D.P.R. 136, 139 (1976).

Ahora bien, hasta que se promovió esta queja, el notario Feliciano Ruiz no había sido objeto de trámite disciplinario alguno. Tiene un historial limpio y de honradez. Goza de excelente reputación profesional. Es obvio que su intervención fue incidental y de la mejor buena fe. *In re Ardín*, 75 D.P.R. 496 (1953). Tampoco tenía el beneficio de los pronunciamientos y guías precisas prospectivas que hoy hacemos. *In re Meléndez Pérez*, supra. En justicia, *la sanción no debe tras-*

*cender más allá de las angustias e inconvenientes dimanantes del esclarecimiento que ha conllevado este enojoso asunto y las que puedan surgir en el futuro en el foro judicial.*

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López emitió opinión disidente y el Juez Presidente Señor Pons Núñez se inhibió.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Hemos expresado en el pasado que una de las labores principales, si no la principal, de este Tribunal es la de implantar normas o guías que no sólo sean justas con todas las partes envueltas en el litigio o controversia ante nuestra consideración en un momento en particular, sino que las mismas deben ser sencillas, claras y de fácil implementación, de manera que ayuden a los miembros de la profesión legal en general en la difícil labor que día a día tienen que desempeñar en nuestra sociedad.[1] Sobreentendido en lo anteriormente expresado, naturalmente, está el hecho de que al deliberar sobre la implantación de una norma el Tribunal tiene la obligación de mantener muy presente y considerar el impacto que la misma pueda tener en la sociedad en general.

Mediante la opinión que se emite en el día de hoy este Tribunal ratifica la práctica notarial a los efectos de que un notario puede otorgar y *elevar a escritura pública* un negocio jurídico que conlleva la enajenación o gravamen de un bien inmueble con la mera aseveración de uno de los comparecientes, a los efectos de que cuenta con poder suficiente para obligar a otro no presente sin que sea necesario que el notario

---

[1] Véase Opinión concurrente emitida por el suscribiente en *Escobar Galarza* v. *Banuchi Pons,* 114 D.P.R. 138 (1983), y voto disidente emitido en *San Lorenzo Trad., Inc.* v. *Hernández,* 114 D.P.R. 704 (1983).

tenga ante sí, antes de otorgar el instrumento, prueba fehaciente del referido poder, siempre y cuando que el notario haga constar en la escritura una fraseología técnica indicativa de lo anteriormente señalado, la cual fraseología se sugiere en la opinión emitida.

Debe quedar meridianamente claro que *no* cuestionamos el hecho de que nuestro ordenamiento jurídico y nuestra jurisprudencia acepta la existencia y validez de la figura del "mandato verbal". Ésta facilita se lleve a cabo o se formalice, desde el punto de vista jurídico, un negocio mediante el cual una persona enajena o grava a favor de otra la titularidad de un bien inmueble perteneciente a un tercero; siendo posible, por consiguiente, que el tercero quede efectivamente vinculado cuando se demuestra la existencia previa del mandato o, de así no poder probarse, dicha actuación es ratificada posteriormente por el tercero dueño. Véase 31 L.P.R.A. secs. 4421 a la 4488. En adición: *El Banco Español de Puerto Rico et al.* v. *Bolívar et al.*, 7 D.P.R. 66 (1904) ; *Casalduc et al.* v. *La Compañía Trasatlántica de Hamburgo*, 9 D.P.R. 350 (1905) ; *Dooley* v. *Pantoja*, 61 D.P.R. 642 (1943) ; *The Bank of Nova Scotia* v. *Vélez Rullán*, 91 D.P.R. 358 (1964), y *Madera* v. *Metropolitan Const. Corp.*, 95 D.P.R. 637 (1967).

Lo que sí cuestionamos es que este Tribunal le brinde su aprobación a la práctica de que dicho negocio jurídico *pueda ser elevado a escritura pública* por un notario, sin que el mismo tenga ante sí el poder mediante el cual el dueño del bien autoriza al compareciente a actuar en su nombre, únicamente exigiendo que el notario incluya en la escritura una fraseología técnica que, en última instancia, tiene como único fin práctico salvar la responsabilidad de este último.

No debemos sustraernos de la realidad de que, por lo general, la mayoría de los otorgantes de una escritura pública en nuestro país son personas legas en estas cuestiones que muchas veces ni leen dichos instrumentos antes de proceder a firmar los mismos, y, si así lo hacen, de ordinario no los en-

tienden. En adición, no debemos olvidar que en opinión de nuestra ciudadanía no se concibe que un negocio jurídico que es elevado a escritura pública pueda ser nulo o inexistente. En otras palabras, la actuación del notario al otorgar una escritura pública le da visos de absoluta legitimidad y efectividad, en la mente de nuestro Pueblo, al negocio realizado.

Somos del criterio que permitir que un notario eleve a escritura pública un negocio jurídico que puede fácilmente resultar inexistente y en la ruina o lesión económica de alguno de los otorgantes del mismo —de resultar falso lo de la existencia del mandato o del "mandante" no ratificar el negocio celebrado— *no puede tener otra consecuencia que minar la confianza pública en nuestra profesión.*

Por otro lado, si es que se entiende que el exigir que esta documentación le sea presentada al notario con anterioridad al otorgamiento de la escritura pública puede resultar en un obstáculo en el tráfico comercial de nuestro país por razón de que en algunas circunstancias se requiera reducir a escrito en determinada fecha el negocio jurídico acordado por las partes, no hay nada que impida que se otorgue un *documento privado* ante notario —en el cual el notario sólo autentica la firma de las partes y la fecha de otorgación del mismo— y se espere, antes de elevar el mismo a escritura pública, por la documentación necesaria, ya que en esta última situación el notario "penetra al campo de la legalidad de la transacción que ante él se concreta", *In re Meléndez Pérez,* 104 D.P.R. 770, 775 (1976), y está "llamado a proteger el derecho de dos o más partes y aun el de tercero que no comparece ante él". *B. & L., Inc. v. P.R. Cast. Steel Corp.,* 114 D.P.R. 808, 810 (1983).

La posición que hoy sostenemos no es de reciente cuño; es la que asumió este Tribunal *hace treinta y cuatro (34) años* al resolver el caso de *In re Cruz Horta,* 73 D.P.R. 227, 231 (1952). En esa ocasión expresamos que un notario *incurría en negligencia,* entre otros actos, al "haber otorgado dicha escritura [de cancelación de hipoteca] sin que el poder [otor-

gado en Estados Unidos por la acreedora hipotecaria] hubiera sido antes protocolizado" en Puerto Rico; ello, no obstante, tener el notario constancia de la existencia del poder por haberlo tenido ante sí con anterioridad al otorgamiento de la escritura pública.

El Tribunal, mediante la norma que hoy establece se preocupa por "salvar" la responsabilidad en que puedan incurrir los notarios otorgantes en esta clase de situación; se olvida por completo del perjuicio que por la aplicación de la misma pueden sufrir nuestros conciudadanos. Es por ello que disiento.